E-filing

FILED

SEP 1 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## FEDERAL APPEAL

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name __Hancock__    __Jeff__    __J__
         (Last)              (First)          (Initial)

Prisoner Number __V-49474__

Institutional Address __#8 Kings Way Avenal, CA 93204__

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

__JEFF JAY HANCOCK__  **C 07 4664**

Full Name of Petitioner

**CW**
**(PR)**

Case No.(To be provided by the clerk of court)

vs.

__D. SEDLEY__
Name of Respondent
(Warden or jailor)

## FEDERAL APPEAL

PETITION FOR A WRIT OF HABEAS CORPUS

## EVIDENCIARY HEARING REQUESTED

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

<u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

1.    What sentence are you challenging in this petition?

(a)  Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Santa Clara County Superior Court Sunnyval Facility

Court                                      Location

(b)  Case number, if known EE402396  Direct Appeal 4027917
(c)  Date and terms of sentence 9/3/04  11 years at 85%
(d)  Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X No

Where? Avenal State Prison #8 Kings Way Avenal, Ca. 93204

(Name of Institution)        (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

ADW §245(a)(1) Enhanced for alleged §211 prior conviction, case #102499 as both a strike §667(b)-(i) and a serious prior §667(a)

3.    Did you have any of the following?

Arraignment: Yes X No __  Preliminary Hearing: Yes X No __ Motion to Suppress: Yes __ No X

4.     How did you plead?

Guilty _____     Not Guilty __X__     Nolo Contendere _____

Any other plea (specify) _____

5.     If you went to trial, what kind of trial did you have?

Jury __X__     Judge alone _____     Judge alone on a transcript _____

6.     Did you testify at your trial?  Yes __X__ No ___

7.     Did you have an attorney at the following proceedings:

(a)     Arraignment    Yes __X__        No ___
(b)     Preliminary hearing         Yes __X__        No ___
(c)     Time of plea    Yes __X__        No ___
(d)     Trial    Yes ___        No __X__
(e)     Sentencing       Yes __X__        No ___
(f)     Appeal        Yes __X__        No ___
(g)     Other post-conviction proceeding        Yes ___        No __X__

8.     Did you appeal your conviction?    Yes __X__  No ___

(a)     If you did, to what court(s) did you appeal?

Court of Appeal       Yes __X__     No ___     2006 Denial 3/24/06
                                               (Year)                    (Result)

Supreme Court of
California            Yes __X__     No ___     2006 Denial 6/14/06
                                               (Year)                    (Result)

Any other court      Yes ___     No __X__     _____
                                               (Year)                    (Result)

(b)     If you appealed, were the grounds the same as those that you are raising in this petition?
                     Yes __X__ No ___

(c)     Was there an opinion?      Yes ___   No __X__

(d)     Did you seek permission to file a late appeal under Rule 31(a)?
                     Yes ___        No __X__

If you did, give the name of the court and the result:

---

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes ✗    No __

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _California Supreme Court_

Type of Proceeding _State Habeas Corpus_

Grounds raised (Be brief but specific):

a.   _Self Incrim., Due Process 5th, 14th_

b.   _Pros. Misconduct, Fair Trial, Due Process 6th 14th_

c.   _Knowing use of perjured testimony by Pros. to_

d.   _obtain conviction, Fair Trial, Due Process 6th, 14th_

Result _Denied_                          Date of Result _7/25/07_

II.   Name of Court _California Supreme Court_

Type of Proceeding _State Habeas Corpus_

Grounds raised (Be brief but specific):

a.   _Trial Counsel I.A.C. Self Incrim. Due Process_
     _5th, 6th, 14th_

b.   _Sentencing Counsel I.A.C. Due Process 6th, 14th_

c.   _Pros. Suppression of evidence, Self-Incrim Fair Trial Due_
                                                      _Process_
Result _Denied_                          Date of Result _7/25/07_
                                                      _5th, 6th, 14th_

III.  Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes ☒ No ☐

Companion Writ For Habeas Corpus, United States
District Court For The Northern District Of California
(Name and location of court)
450 Golden Gate Ave. San Francisco, CA. 94102

## B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: Improper Flight Insruction CALJIC 2.52
See Attached Brief

Supporting Facts: _____

_____

_____

_____

Claim Two: _____

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

_See Attached Brief_

Do you have an attorney for this petition?     Yes ☐ No ☒

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on _9/4/07_     _____
                Date                Signature of Petitioner

( rev. 5/96)

9

# TABLE OF CONTENTS

Table of Authorities ................................................................. ii

STATEMENT OF THE CASE ................................................. 1

STATEMENT OF FACTS ...................................................... 2

ARGUMENT ......................................................................... 3

THE COURT OF APPEAL ERRED WHEN IT HELD THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A FLIGHT INSTRUCTION; INSTRUCTION WITH CALJIC NO. 2.52 ▇▇▇▇ WHERE THERE WAS, IN FACT, NO EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED APPELLANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS......................................................... 3

A. The Opinion Represents an Unreasonable Application of the Law to the Facts. ................................................................. 3

B. It Was Error To Give A Flight Instruction Where There Was No Evidence Of Flight. ................................................... 5

C. The Error Violated Appellant's Sixth And Fourteenth Amendment Rights Because It Lessened The Prosecution's Burden Of Proof.....9

D. The Error Was Prejudicial. ............................................. 11

CONCLUSION ...................................................................... 17

i

# TABLE OF AUTHORITIES

**Cases**
                                                                                    **Page**

*Alberty v. United* States (1896) 162 U.S. 499 ......................................................10

*Chapman v. California* (1967) 386 U.S. 18 ...........................................................11

*Francis v. Franklin* (1985) 471 U.S. 307 ..............................................................11

*In re Winship* (1970) 397 U.S. 358 ........................................................................9

*Leary v. United* States (1969) 395 U.S. 6 .............................................................10

*People v. Anjell* (1979) 100 Cal.App.3d 189 .........................................................9

*People v. Bradford* (1997) 14 Cal.4th 1005 ...........................................................8

*People v. Bradford* (1997) 14 Cal.4th 1005 ...........................................................3

*People v. Cannady* (1972) 8 Cal.3d 379 ...............................................................7

*People v. Clem* (1980) 104 Cal.App.3d 337 ........................................................7,9

*People v. Crandell* (1988) 46 Cal.3d 833 ............................................................5,6

*People v. Fremont* (1937) 22 Cal.App.2d 292 ......................................................8,9

*People v. Green* (1980) 27 Cal.3d 1 ....................................................................7,9

*People v. Martinez* (1999) 20 Cal. 4th 225 ...........................................................7

*People v. Mason* (1991) 52 Cal.3d 909 .................................................................9

*People v. Mendoza* (2000) 24 Cal.4th 130 ............................................................11

*People v. Pitt* (1990) 223 Cal.App.3d 606 ...........................................................8,9

*People v. Saddler* (1979) 24 Cal.3d 671 ................................................................6

*People v. Saddler,* supra, 24 Cal.3d ......................................................................6

*People v. Turner* (1990) 50 Cal.3d 668 ...............................................................7,9

*People v. Valdez* (2004) 32 Cal.4th 73 ..................................................................6

# TABLE OF AUTHORITIES, cont.

*People v. Watson* (1977) 75 Cal.App.3d 384........................................................7

*Ulster County Court v. Allen* (1979) 442 U.S. 140........................................10, 11

*Wong Sun v. United States* (1963) 371 U.S. 471, 483, fn. 10..............................10

**Statutes**

Penal Code,

      section 245, subd. (a)(1)..................................................................................1
      section 1127c....................................................................................................7

**Constitutions**

United States Constitution,

      Sixth Amendment...........................................................................4, 9,11,17
      Fourteenth Amendment................................................................4, 9,11, 17

**Other**

California Rules of Court, rule 28(b) ...................................................................1

California Rules of Court, rule 33.3 .....................................................................1

CALJIC No. 2.52 ...........................................................................3-5, 7, 9, 11,17

## STATEMENT OF FACTS

On August 7, 2003, appellant and his roommate, Craig Davis, both heavy alcoholics who were drunk at the time, had a disagreement in which appellant ended up jabbing Mr. Davis in the shoulder with a small kitchen knife. (RT 61, 311.) According to Davis, appellant simply came out to the place he was sitting and stabbed him after they had had words (RT 61); appellant, however, said he had jabbed Mr. Davis during a fight between the two men, only after Mr. Davis had hit him in the head with a frying pan. (Augmented CT 30-31, RT 308-309, 311-313.)

A neighbor who stopped by and saw Mr. Davis's injuries convinced appellant that they should call the paramedics, which, he testified, necessarily meant calling the police. (RT 141.) He suggested that appellant leave, but appellant, who did not want to go, merely went into his bedroom. When he tried to come out into the living room after about ten minutes, he ran into police officers. (RT 141, 319

## STATEMENT OF THE CASE

On May 24, 2004, appellant was convicted after jury trial of assault with a deadly weapon, a knife. (Pen. Code, §245, subd. (a)(1).) After admitting a prior "strike" conviction, appellant was sentenced to 11 years in state prison. (CT 283.)

## ARGUMENT

**THE COURT OF APPEAL ERRED WHEN IT HELD THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A FLIGHT INSTRUCTION; INSTRUCTION WITH CALJIC NO. 2.52 ▮▮▮▮ WHERE THERE WAS, IN FACT, NO EVIDENCE OF FLIGHT LESSENED THE PROSECUTION'S BURDEN OF PROOF AND VIOLATED APPELLANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS**

### A.    The Opinion Represents an Unreasonable Application of the Law to the Facts.

Appellant urged that the evidence was insufficient to support instruction with CALJIC No. 2.52, which advised the jury that it may consider the "flight of a person immediately after the commission of a crime" as a fact "to be considered in light of all the other proved facts in deciding whether a defendant is guilty or not guilty" (CT 477), because there was no evidence that appellant had "departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)\

The  Court of Appeal, however, held otherwise, holding that the evidence was legally sufficient to support the flight instruction, "even though defendant also testified to an innocent purpose in leaving the living areas of his apartment and going into his bedroom and closing the door" because "Craven testified that, although he could not talk defendant into leaving the

3

apartment, he did convince defendant to retreat to the bedroom before help arrived for Davis" and "[t]his evidence, if believed by the jury, supported an inference the defendant's purpose in moving into the bedroom was to avoid being observed by responding authorities from which the jury could infer consciousness of guilt." (Opn. at 10.)

This conclusion ignores the undisputed evidence that appellant: 1) refused to leave the apartment;[2] and 2) voluntarily left his bedroom as soon as the police arrived, attempting to come out into the living room where they were. Officer Kim testified that as he was standing in the living room with Davis, he heard noises in appellant's bedroom: "As I heard it, the door started to come open, and then that's when I blocked the door from opening up onto us with my foot." (RT 155.)  Under these facts, there was no evidence to justify instruction with CALJIC No. 2.52.

The Opinion, then, represents an unreasonable application of the law to the facts. As the trial court's instruction with CALJIC No. 2.52 in the absence of evidence of flight motivated by a "consciousness of guilt," was created an unconstitutional permissive inference, it violated appellant's Fourteenth Amendment right to due process of law.

_____

[2]RT 141.

4

**B.     It Was Error To Give A Flight Instruction Where There Was No Evidence Of Flight.**

It is error to instruct the jury with CALJIC No. 2.52 where there is no evidence that a defendant has fled the scene of the crime or otherwise sought to evade the notice of the authorities. (*People v. Crandell* (1988) 46 Cal.3d 833, 869.) In *Crandell*, the defendant had left the house after the homicides "for reasons other than fear of immediate apprehension and with the intention to return to dispose of the bodies." He argued that such leaving did not, as a matter of law, constitute flight, so that the trial court should not have instructed the jury that it could consider it as evidence of guilt. (*Id.* at 869.)

The California Supreme Court agreed, finding error because the defendant's leaving could not be considered to be flight "in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested." (*Ibid.*) Defendant's actions did not constitute flight because he "did not leave to avoid being observed (his presence at the house on the morning following the murders was already known to Juan Salasar, among others) and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of returning to dispose of the bodies. There is no evidence he ever wavered in this intent; indeed, he was arrested while returning and less than

5

a block from the P. house." (*Id*. at 869-870.)

There is even less evidence of flight here than there was in *Crandell*. Appellant did not leave the scene of the incident, and he did not take any actions to evade notice. On the contrary, he chose to stay in his apartment even though he knew the police were on their way and a neighbor was urging him to leave. He did not hide in the closet; he did not lurk under the bed; he did not cower in the shower. He merely walked into his own bedroom, where the police found him shortly afterwards. (RT 141, 319.) These acts were insufficient as a matter of law to constitute flight and to support an inference of guilt.

"It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, believed by the jury, will support the suggested inference [citation.]." (*People v. Saddler* (1979) 24 Cal.3d 671, 681; see also *People v. Valdez* (2004) 32 Cal.4th 73, 137.) Thus the trial court has a duty not only to instruct on the relevant principles of law, but also "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." (*People v. Saddler*, *supra*, 24 Cal.3d at 681.). The trial court here violated that duty by instructing that the jury

6

could consider appellant's "flight" in deciding his guilt in the absence of any evidence justifying such an inference.

While a trial court must give CALJIC No. 2.52 in "appropriate cases" - that is, whenever "evidence of flight of a defendant is relied upon as tending to show guilt...."(§ 1127c; *People v. Cannady* (1972) 8 Cal.3d 379, 391), it is error to give the instruction where the evidence does not support an inference of guilty flight. In *People v. Watson* (1977) 75 Cal.App.3d 384, for example, giving the instruction was held to be error when the only evidence supporting flight was the fact that the defendant was arrested two days after the murder and several miles from where the victim's body was discovered. (*Id.* at 403.) Similarly, the instruction was held to be error in *People v. Clem* (1980) 104 Cal.App.3d 337, 344, where the victim testified Clem stepped out of the car, enabling her to hurriedly lock all the doors and drive away from him, so that it was actually the victim who fled the scene, and not the defendant. (See also *People v. Turner* (1990) 50 Cal.3d 668, 695 [mere return to familiar environs from the scene of crime does not warrant an inference of consciousness of guilt]; *People v. Green* (1980) 27 Cal.3d 1, 37, overruled on other grounds by *People v. Martinez* (1999) 20 Cal. 4th 225, 241 [recognizing law warning courts not to confuse mere departure from scene of crime with deliberate flight from area in which

7

suspect is normally to be found.]; *People v. Fremont* (1937) 22 Cal.App.2d 292, 300 [error to give flight instruction where there was no evidence of flight, because "[n]o instruction should be given to the jury unless adapted to the evidence and circumstances of the case."]; and *People v. Pitt* (1990) 223 Cal.App.3d 606, 876 [giving flight instruction was error where the defendant had changed residences around the time he learned of the arrests of charged coconspirators but had stayed at his usual place of employment.]

The chasm between the factual scenario here, on the one hand, and in circumstances under which a flight instruction is justified, on the other, is admirably demonstrated by *People v. Bradford* (1997) 14 Cal.4th 1005. In *Bradford*, the defendant challenged a flight instruction because he had not left the apartment building in which the murder occurred. The California Supreme Court held that giving the instruction had not been error, for while that the defendant may not have left the building, "he left Kokes's apartment after killing her, told Stevens, 'I really got to get the hell out of here,' packed his belongings, asked DeLong if he could stay with her near Fresno, and repeatedly pleaded with his roommate to drive him out of town." (*Id.* at 1054.)

The facts of this case, however, are notably distinguishable. Appellant did not leave the apartment in which the incident had occurred. Rather than

8

telling someone he had to "get the hell out of here," he resisted the advice of two neighbors who told him that he should go or he might get in trouble, and insisted on staying. He made no preparations for leaving, and he made no requests for assistance in getting out of town. As instructing with CALJIC No. 2.52 is error where the evidence "could not logically support an inference of guilt," (*People v. Anjell* (1979) 100 Cal.App.3d 189, 201 [overruled on another point in *People v. Mason* (1991) 52 Cal.3d 909, 942-943]) and the circumstances of this case are even less supportive of an inference of guilt than those in *Clem, Turner, Fremont, Pitt , Watson* or *Green* , it was error to instruct with CALJIC No. 2.52.

### C.    The Error Violated Appellant's  Sixth And Fourteenth Amendment Rights Because It Lessened The Prosecution's Burden Of Proof.

The challenged instruction allowed the jury to infer from appellant's retreat to his bedroom - an act that was insufficient as a matter of law to constitute flight - that he was conscious of guilt, and hence, guilty of the charged offense. That inference, which was utterly inappropriate because unsupported by the evidence, lessened the prosecution's burden of proof to prove every element of the case beyond a reasonable doubt, and violated appellant's Sixth and Fourteenth Amendment rights to trial by jury and due process. (*In re Winship* (1970) 397 U.S. 358, 364

An instruction that creates a "permissive inference," that is, an inference the jury may choose to credit or reject, violates due process where "there is no rational way" the trier of fact could make the "connection permitted by the inference." (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) Thus an instruction unconstitutionally shifts the burden of proof where it cannot be said with "'substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.'" (*Id.* at 166 fn. 28, quoting *Leary v. United States* (1969) 395 U.S. 6, 36.)

It is impossible to say with substantial assurance first, that guilt is more likely than not to flow from flight, and second, that there *was* any proved fact here on which to base an inference. The United States Supreme Court has, by its own pronouncement, "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." (*Wong Sun v. United States* (1963) 371 U.S. 471, 483, fn. 10.) As it explained more than a hundred years ago in *Alberty v. United States* (1896) 162 U.S. 499, 511:

> ...it is not universally true that a man who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right, and proper,' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being

flee                    10

apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'

The problems inherent in all flight instructions are impermissibly exacerbated where, as here, those instructions have no evidentiary basis. Instructing the jury with CALJIC No. 2.52 in the absence of any evidence of flight falls squarely under the *Ulster* definition for unconstitutional permissive inferences.  As the suggested conclusion "was not one that reason and common sense justify in light of the proven facts before the jury," it violated appellant's Fourteenth Amendment right to due process of law. (*Francis v. Franklin* (1985) 471 U.S. 307, 314.)

Appellant is aware that in *People v. Mendoza* (2000) 24 Cal.4th 130, 179, the California Supreme Court rejected the argument that CALJIC No. 2.52 unconstitutionally lessens the prosecution's burden of proof. *Mendoza* is distinguishable, however, because in that case there was some evidence justifying the instruction. In a case like this one, where there was no evidence of flight at all,  the instruction was not justified by reason and common sense, so violated appellant's Sixth and Fourteenth Amendment rights.

**D. The Error Was Prejudicial.**

As the error implicated appellant's federal constitutional rights, it must be judged under *Chapman v. California* (1967) 386 U.S. 18, 24. As it

11

cannot be shown beyond a reasonable doubt that the jury would have voted to convict in the absence of the erroneous instruction, the conviction must be reversed.

As the prosecution itself acknowledged, this case came down to a credibility contest between appellant and Davis. The charge was assault with a deadly weapon, and the crux of the case was whether or not appellant had jabbed Davis in self-defense. Davis, who acknowledged that he "may have socked [appellant] in the eye once (RT 182), said appellant stabbed him for no reason; on the other hand, appellant said he only jabbed Davis with the paring knife after Davis bashed him in the head with a frying pan. The prosecution framed the contest like this:

> If you don't believe the defendant, if you throw out the defendant's testimony, then you have zero evidence of self-defense. None. You could go back there and all vote guilty right away, because there is simply no evidence of self-defense before you. It is not your job to create a defense.
> You took an oath to apply the evidence, the facts you heard from the witness stand, of the exhibits, to the law. I submit to you that the defendant was lying. I used the word "lie" a few times, because he lied. And that Mr. Davis's version is accurate. (RT 520-521.)

The evidence, however, suggested otherwise. Davis was a self-confessed long-time alcoholic. Although he testified that his admittedly seriously impaired memory had been defying the usual laws of nature by

"getting better" since the time of the preliminary hearing (RT 84), he did not remember whether appellant had been so upset at his behavior at the picnic that he asked him to leave (RT 92); was "kind of vague" as to whether he and appellant were inside the apartment before the incident, as he had testified at the preliminary hearing (RT 93); was unsure whether appellant had given him a washcloth to clean up his face (RT 94, 98); and was not sure whether he had thrown a punch at appellant. (RT 96.) When asked if appellant had "just walked right up and stabbed you," he replied, "I'm pretty sure that's how that happened." (RT 99.) He testified that appellant stabbed him in the back, and then in the front, on his hand, but did not remember appellant coming around him to do so. (RT 101.) Asked if the neighbor had helped him back into appellant's apartment, he said, "I think that's how it happened. You'd have to ask Pete. He would know.... I just don't really remember a whole lot about that last part of it there, just bits and pieces." (RT 102.) Asked if he remembered that it was actually one of the paramedics who told him he had been stabbed, he said "I don't remember that." (RT 103.) Reminded that he had testified to that effect at the preliminary hearing, he said, "Yeah, that's probably correct." (RT 103.) He "kind of" remembered falling into the top of the marble countertop in the bathroom three days before the incident (RT 104) and when asked if he remembered

13

that he hit it so hard  that it actually shifted, answered: "Probably." (RT 104.) He could have hit it with his back or his hip or perhaps his torso - but he didn't remember. (RT 104.)

He did not remember telling Officer Kim he had told appellant that he needed to get some papers out of the house;  he "may have said it. I just don't remember -- I don't have like total recall of that night." (RT 109.) He acknowledged that his memory of being stabbed  was "pretty foggy." (RT 112.) He did not remember if he was taken into the kitchen to clean up; asked if that could explain the fact that his blood was in the kitchen although he testified that the stabbing took place outside, he said, "It's a possibility too," and acknowledged that he did not remember clearly. (RT 119.) Asked on re-direct if it was true that the first time he realized he had been stabbed is when his neighbor told him about it, he replied: "It may  have been. I'm not a hundred percent positive, but it's -- most likely, seems to me." (RT 123.) It was not until he was coached very specifically that he remembered to say he believed he was stabbed when appellant came out of the apartment:

> Q: Let me ask you a more direct question. Were you telling me the truth earlier today about what happened that day?
> A. Oh, yes.
> Q. So when Jeff came back out of the apartment, you did feel a sharp pain?
> A. Yes.
> Q. And you did think that you got stabbed?
> A. Yes.

14

Q. Now, you hesitated for a moment. Why did you hesitate?
A. You know, when it happened I just couldn't believe this
was happening. I didn't want to believe it.
Q. And you knew that it was Jeff that just stabbed you.
A. Yeah. (RT 123.)

On re-cross, however, Davis changed his story again, re-affirming

that the first time he realized he had been stabbed when was when the

neighbor told him. (RT 124.) At the preliminary hearing, he testified that he

did not remember how he received the wounds on his hand; he and appellant

were rolling around on the concrete and he felt a sharp pain in his hand. At

trial he said that this statement had been the truth (RT 112-113), but he also

testified - contradictorily - that appellant had stabbed him in the hand as he

was standing outside, not rolling around on the ground. (RT 123.)

In sum, Davis, on whose testimony the entire case rested, was a

hugely unimpressive witness whose story, rife with lacunae and contradiction,

shifted with the breeze of each new examination. Appellant, on the other

hand, had a clear recollection of the evening, and a credible explanation for

not wanting to tell the police that the man he had been supporting for three

months "out of the goodness of his heart"[3] had hit him in the head with a

frying pan. His black and blue eye supported his account (RT 157), as did

the fact that Davis's blood had been found in the kitchen, where appellant

[3]Davis's own words. (RT 44, 120.)

15

said the jabbing took place. (RT 119.)

Defense counsel did the best he could with the flight instruction, arguing that it actually showed an *absence* of guilt (RT 517-518), but this was mere whistling in the dark - the jury was never instructed that it could consider an absence of flight as an indication of innocence. On the contrary, the flight instruction allowed the jury to infer from appellant's retreat to his bedroom - an act that was insufficient as a matter of law to constitute flight - that he was conscious of guilt, and had therefore been guilty of the charged offense. As the only evidence that appellant had not stabbed Davis in self-defense came from a supremely questionable source, it cannot be shown beyond a reasonable doubt that the jury would have convicted appellant in the absence of the encouragement to perceive appellant as guilty. The conviction must be reversed.

CONCLUSION

Prosecution witness Peter Cravens testimony was contradictory (RT Vol. II pg. 132 lns. 5, 27, 28) (RT Vol. II pg. 140 lns. 16, 17, 28). Cravens previous testimony (RT Vol II pg. 134 lns. 9, 13, 20, 21) was contradicted by testimony of two following prosecution witnesses. Police Officer Kirk Kim (RT Vol. II pg. 163 lns. 4-6) and by Police Officer Andrew Zarriello (RT Vol. II pg. 211 lns. 13-16). The prosecutions justification for CALJIC 2.52 rests on the credibility of prosecution witness Peter Cravens testimony. Petitioner / Appellant does not believe that the fact of flight by the Appellant was proved in order to substantiate the CALJIC 2.52 Instruction. The conviction must be reversed. The flight instruction created an unconstitutional inference that lightened the prosecution's burden of proof and violated appellant's sixth and fourteenth Amendment rights.

Dated: September 4, 2007          By:

Jeff Hancock

# CERTIFICATE OF COMPLIANCE

I, Jeff Hancock, certify and declare that the attached federal appeal, exclusive of Table of Contents, Table of Authorities, and Transcripts, contains 3,779 words.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration was executed on September 4, 2007 at Avenal State Prison, Avenal, California.

*Jeff Hancock*

Jeff Hancock

# APPENDIX A

## Supreme Court

Change court ⬍

Court data last updated: 02/20/2007 11:53 AM

**Case Summary**    **Docket**    Briefs
Disposition    Parties and Attorneys    Lower Court

# Docket (Register of Actions)

**PEOPLE v. HANCOCK**
**Case Number S143149**

| Date | Description | Notes |
|------|-------------|-------|
| 05/04/2006 | Petition for review to exhaust state remedies filed | Jeff Hancock, Defendant and Appellant. (CRC 40.1 - priority mail) Candace Hale, CA - appointed |
| 05/05/2006 | Record requested | |
| 05/09/2006 | Received Court of Appeal record | one file jacket/ briefs/ accordian folder |
| 06/14/2006 | Petition for review denied | |

Click here **to request automatic e-mail notifications about this case.**

CT30

```
 1            THE COURT:  WELL, I'M GOING TO SUSTAIN THE
 2   OBJECTION.  YOU CAN APPROACH IT A DIFFERENT WAY, PERHAPS, IF
 3   YOU'D LIKE, BUT I'LL SUSTAIN THAT OBJECTION.
 4   Q    (BY MR. DEMERTZIS)  YOU TOLD US EARLIER THAT YOU THINK
 5   THE DEFENDANT IS AN OKAY GUY.  I DON'T REMEMBER WHAT WORDS
 6   YOU USED, BUT YOU THINK HE'S AN OKAY GUY; RIGHT?
 7   A    YEAH, HE'S A GOOD GUY.
 8   Q    HE'S A GOOD GUY?
 9   A    YEAH.
10   Q    DO YOU WANT TO SEE HIM GET IN TROUBLE?
11   A    NO, I DON'T.
12   Q    ARE YOU PROTECTING HIM RIGHT NOW WITH YOUR TESTIMONY?
13   A    I'M JUST TRYING TO TELL YOU THE TRUTH.
14   Q    FAIR ENOUGH.
15   A    WHAT I RECALL.  AND I DON'T REMEMBER EVERYTHING.
16   Q    FAIR ENOUGH.  DO YOU NOT REMEMBER CERTAIN THINGS
17   BECAUSE YOU BLACKED OUT?
18   A    I DON'T THINK I BLACKED OUT.  I WAS HAZED, YOU KNOW,
19   DAZED.
20   Q    HAVE YOU TALKED TO THE DEFENDANT SINCE THIS ALL
21   HAPPENED?
22   A    NO, I HAVEN'T.
23   Q    NOT AT ALL?
24   A    NO, I HAVEN'T.
25   Q    ALL RIGHT.  YOU REMEMBER TALKING TO OFFICER KIM THAT
26   DAY, THE GENTLEMAN SEATED HERE IN UNIFORM?
27   A    AT THE HOSPITAL.
28   Q    DO YOU REMEMBER TALKING TO HIM AT THE SCENE?
```

# TRANSCRIPTS

CT31

1    A    I DON'T RECALL.

2    Q    DO YOU REMEMBER TELLING OFFICER KIM AT THE SCENE THAT

3    YOU THOUGHT THREE MEXICAN GUYS JUMPED YOU AT THE FAIR OAKS

4    APARTMENT?

5    A    OH, OKAY.  YEAH, I DID SAY THAT.

6    Q    DID YOU TELL OFFICER KIM THAT ONE OF THESE THREE

7    MEXICAN GUYS CAME UP FROM BEHIND AND STABBED YOU?

8    A    I DON'T RECALL SAYING THAT.

9    Q    DID YOU TELL OFFICER KIM THAT THE THREE MEXICAN GUYS

10   THEN, QUOTE, TOOK THE BOOTS, UNQUOTE TO YOU?

11   A    YEAH, HE --

12          MR. CAMPERI:  YOUR HONOR, I'LL OBJECT, BECAUSE I

13   BELIEVE THE DISTRICT ATTORNEY IS ATTEMPTING TO IMPEACH THE

14   DEFENDANT, AND I DON'T KNOW IF THERE'S ANY -- THIS IS

15   IMPROPER, AND IT SHOULD BE REFRESHING RECOLLECTION FIRST,

16   AND AT THAT POINT THERE MUST BE A DETERMINATION AS TO

17   WHETHER IMPEACHMENT IS APPROPRIATE.

18          THE COURT:  I'LL OVERRULE THAT OBJECTION.

19   Q    (BY MR. DEMERTZIS)  DO YOU RECALL TELLING OFFICER KIM

20   THAT THESE THREE MEXICAN GUYS TOOK THE BOOTS TO YOU?

21   A    YEAH, I BELIEVE I SAID THEY GAVE ME THE BOOT MASSAGE.

22   Q    DID OFFICER KIM AT THE SCENE TELL YOU THAT HE DID NOT

23   THINK YOU WERE TELLING HIM THE TRUTH?

24   A    HE TOLD ME THAT AT THE HOSPITAL.  I DON'T REMEMBER HIM

25   SAYING THAT AT THE SCENE, AT JEFF'S PLACE.

26   Q    SO OFFICER KIM COULD HAVE SAID AT THE SCENE THAT HE

27   DID NOT BELIEVE YOU, YOU JUST DON'T REMEMBER?

28   A    HE COULD HAVE.

```
L+1   SUPERIOR COURT                           CASE NO.      EE302496
      605 W. EL CAMINO                         CEN           03041987
      SUNNYVALE, CA 94087          DATE    09/03/2004  8:30 A  DEPT.    81
PEOPLE VS.                                    11/02/1958 CAN4777473
                    JEFF JAY HANCOCK   CLERK   CARRIE WOOLLEY        BBI263 M
L.K.A.   675        JOHANNA      7    HEARING  PROBATION AND SENTENCING
         SUNNYVALE, CA 94085         AGENCY   SV-04316-93501-CHAVARRIA
JUDGE    HON. JOHN J. GARIBALDI      STATUS   I-SET -100000         TW    Y
REPORTER CARLA GOMEZ                 APO
DEF. ATTY. SCHROEDER, WESLEY  D.A. DCMUTZIS
CHARGES  F(001)PC245(A)(1)    001                        VIOLATION DATE
                                                         08/07/2003
```

**NEXT APPEARANCE** _____

☑ Defendant Present ☐ Not Present      ☑ Atty Present _Wesley Schroeder_      AD / PD / Legal Aide / Special App
☐ WFA ☐ Arr'd ☐ Amended complt        ☐ Arr ☐ Plea ☐ IDC ☐ Prob / Sent      ☐ Interp_____
☐ PC977 Waiver ☐ Filed ☐ On file       ☐ Bail/ OR/ SORP ☐ Rect Dr Rpt ☐ FAR  ☐ Pretrial Services to Contact Gateway for Assm't
☐ NG ☐ Entered by CRT ☐ NGBRI / Adv    ☐ PSet ☐ Prelim ☐ PTC ☐ S/B MTC       ☐ Bail Reinstated ☐ Bail Exonerated
☐ Priors / Allegations / Enhancements Denied ☐ Further ☐ Jury ☐ CT ☐ Peo/Def Wav Jury  ☐ Forfeited    Bond #_____
☐ TW ☐ TNW ☐ TW/ ☐ for Sent            ☐ Proof of _____                 ☐ Reassumption Filed ☐ Forfeiture Set Aside
☐ Ref / Appt PD / ADO ☐ Conflict Decl   ☐ Ref'd _____                    ☐ $_____  Costs Within 30 Days to Court
☐ Relieved ____ Appt'd                  ☐ Crim Proc Susp ☐ Rein                SORP / OR ☐ Revoked ☐ Reinstated
☑ Hrg on Motion _Romero_                ☐ Doubt Decl Pursuant PC 1368           ☐ BW Ordered $_____              ☐ Stayed
☐ Granted ☐ Den ☐ Subm _DOC/ LWOP_      ☐ Set on rept ☐ Found _____      ☐ BW Set Aside ☐ Recalled ☐ To Issue
☐ Drs. Appointed                        ☐ Max Term ____ ☐ Committed             Other:_____
☐ Prelim Waived ☐ Certified to General Jurisdiction  MDA / COM Amended to _____

**PLEA Conditions:** ☐ None ☐ No State Prison ☐ PC17 after 1 Yr Prob ☐ Includes VOP_____
☐ Jail / Prison Term of _____                                          ☐ Subm time of sent
☐ Dismissal / Striking _____                                           ☐ Future serious felony prior ☑ PC12021 (gun)
☐ Adv ☐ Max Pen ☐ Parole/Probation ☐ Appeal ☐ Immig ☐ Reg PC290/HS11590/PC457.1/PC186.30
☐ Waives Constit Rights ☐ Written Waiver filed ☐ **PC17 REDUCTION** ☐ Waives Arbuckle ☐ Harvey Stip _____
☐ COP PLEADS ☐ **GUILTY** ☐ **NOLO CONTENDERE** to charges & admits enhs/priors (see below)  ☐ Factual Basis found ☐ Findings stated
☐ Notice of Eligibility Filed ☐ DEJ Granted ☐ Opt to DADS ☐ DEJ Rein ☐ DEJ Term ☐ Guilty Plea Rendered
☐ Waives Referral ☐ Ref'd to APO Full Rpt ☑ **PROBATION DENIED**   FINES/FEES:  PAY TO  ☐ Ref to DOR $_____
☐ Sentenced to ____ ☐ State Prison/County Jail ☐ Sent Suspended   COUNT ____ ___+ PA $_____  ☐ Purs HS11350d
**PROBATION** ☐ Execution ☐ Imposition of sentence suspended for probation period  COUNT ____ + PA $_____
☐ COURT ☐ FORMAL PROBATION GRANTED for ____ Days / Mos / Yrs    COUNT ____ + PA $_____
☐ Report to APO within ____ Days ☐ Upon Release ☐ Terminated     DPF / AIDS $_____
☐ Commun Altern Program ☐ Perform ____hrs Volunteer Work         DRF / RF  $2200 Add'l RF$ 2200 Susp'd PC1202.45
☐ Submit Search / Testing ☐ Educ / Voc Trng / Empl              DEJ _____  CTS PC 2900.5  $_____
☐ Not drive w/o valid DL & Ins ☐ DVPO Issued / mod / term Exp    AEF $_____  **TOTAL DUE**  $_____
☐ Not own/possess deadly weapons ☐ Weapon ordered destroyed      ADPA $_____ ☐ Committed @ $_____ /Day
☐ No contact w/victim or family / co-defts unless appv by APO ☐ PC1202.05  LAB $_____ ☐ Consec/Conc to _____
☐ No alcohol / drugs or where sold ☐ Restitution _Victim Grand_  ASF / CPF $_____ ☐ Payments Granted / Modified
☐ Substance abuse, Domestic Violence, Psychological, Parenting cnsl / prgm  AR $_____ / Mo beginning _____
☑ PC298 (DNA) ☐ PC1202.1 (Aids Testing) ☐ Aids Education Program  SHELTER $_____ ☐ FINE STAYED
☐ Other:_____                                            DV $_____ ☐ Fine Deemed Satisfied ☐ Commuted
                                                                ATTY $_____ ☐ Vol Wk ____Hrs In Lieu of Fine
**VOP:** ☐ Arr'd VOP ☐ Admits/Denies Violation ☐ Court Finds VOP / No VOP  P/INV $_____ ☐ DSA thru APO / DOR / CRT ☐ Filed
☐ Prob Rein / Mod / Term / Revoked / Remains Revoked / Ext to ____  CJAF $_____ ☐ P/SUP $____ /Mo
☐ Original Terms & Conditions Except as Amended Herein           ☐ Restitution $_____  ____ to _____
Coterminous with ____ ☐ No Further Penalties                     ☐ Referred to VWAC  ☐ As Determined APO / CRT

**JAIL/PRISON** ☐ See Attachm't Pg for Add'l Orders, Charges, PC1385 Reasons

| Count | F/M | Violation | Prison Term / Yrs | Enhancement / Priors | Yrs / Styd / Strkn | County Jail |
|---|---|---|---|---|---|---|
| 1 | F | PC245(a)(1) | M (4yrs Probation/Mid yr) PC12022.7(a)(1/1202.1(e)(3)-5 Strike prs to PC1385 doc to PC667(b)-(i)/1170.12 | 2x base term to ct. 1 | | |

| Enhancement | Yrs/S | Enhancement | Yrs/S | Enhancement | Yrs/S | Enhancement | Yrs/S | Enhancement | Total |
|---|---|---|---|---|---|---|---|---|---|
| PC667(b)-(i)/1170.12-2x base PC667(a) 5yrs C/3 to Ct.1 | | | | | | | | | 54 yrs |

CTS = _344_  ACT + _59_ ☐ PC4019 ☐ PC2933.1 _453_ **TOTAL DAYS**   **TOTAL TERM** _11 yrs CDC_
☐ Straight time ☐ WWP ☐ PC1209 Fees ☐ Waived ☐ Court Rec____  ☐ Except ☐ EMP/PSP/WF/EBP/DBRC Parole/NP  CT 283
☐ Sent Deemed Srvd ☑ Rpt to Local Parole ☑ Adv of _3_ Yrs Parole/Appeal Rights ☐ Consec ☐ Conc to _____
☐ Bal CJ Susp ☐ All but ____Days/Mos ☐ On Cond Complete Residential Treatment Prgm ☐ Serve Consec MO/TU/WE/TH/FR/SA/SU
☐ Pre-process _____ AM/PM ☐ Stay/Surrender Transport to _____ @ _____ AM/PM or Sooner

☐ REMANDED–BAIL $_____ ☐ **NO BAIL** ☑ **COMMITTED**  ☐ RELEASED ☐ OR ☐ SORP ☐ DOC TO CONTACT JAC FOR ASSM'T
☐ AS COND OF SORP ☐ BAIL INCREASED / REDUCED           ☐ TO PRGM AS REC BY JAC-DOC TO TRANSPORT FOR BALANCE OF JAIL

DISTRIBUTION:  BLACK - FILE COPY,  GREEN - DOC,  BLUE - CJIC,  PURPLE - DOR/PROBATION,  BROWN - DEFENDANT

1        THE WITNESS:  SORRY ABOUT THAT.

2    Q    (BY MR. DEMERTZIS)  AND THE REASON FOR THAT,

3    MR. DAVIS, IS SO THAT THE REPORTER CAN TAKE DOWN EVERYTHING

4    WE'RE SAYING AND THE RECORD WILL BE CLEAR.

5    A    OKAY.

6    Q    DO YOU KNOW A PERSON BY THE NAME OF JEFF HANCOCK?

7    A    YES, I DO.

8    Q    DO YOU SEE HIM IN THE COURTROOM NOW?

9    A    YES.

10   Q    PLEASE POINT HIM OUT, WHERE HE'S SITTING AND WHAT HE'S

11   WEARING.

12   A    HE'S SITTING RIGHT OVER HERE IN A TIE AND A BEIGE

13   SHIRT.

14        MR. DEMERTZIS:  YOUR HONOR, MAY THE RECORD REFLECT

15   MR. DAVIS HAS IDENTIFIED THE DEFENDANT?

16        THE COURT:  IT WILL.

17   Q    (BY MR. DEMERTZIS)  HOW DO YOU KNOW THE DEFENDANT?

18   A    HOW DO I KNOW HIM?

19   Q    YEAH, HOW DO YOU KNOW HIM?  WHEN DID YOU MEET HIM?

20   WHAT KIND OF RELATIONSHIP DID YOU HAVE?

21   A    WE WERE PRETTY GOOD FRIENDS.  I MET HIM PROBABLY A

22   COUPLE OF YEARS AGO.  A LITTLE FURTHER BACK THAN THAT.

23   MAYBE THREE YEARS.

24   Q    AT SOME POINT WERE YOU AND THE DEFENDANT LIVING

25   TOGETHER?

26   A    YES.

27   Q    WHERE WAS THAT?

28   A    WE LIVED OFF OF JOHANNA AND THEN OFF OF CALIENTE.

1   Q    WHERE WERE YOU WHEN THE BEATING STOPPED?

2   A    I WAS LAYING ON THE CONCRETE.

3   Q    WHERE EXACTLY?

4   A    LIKE AROUND THE CORNER FROM THE FRONT DOOR.  ABOUT TEN

5   FEET AWAY.

6   Q    THIS PICTURE ON THE PROJECTOR RIGHT NOW, IF YOU WERE

7   LAYING WHERE YOU WERE THAT DAY WHEN THE BEATING STOPPED,

8   WOULD WE BE ABLE TO SEE YOU IN THAT PICTURE?

9   A    NO, BECAUSE I WOULD BE RIGHT AROUND THE CORNER.

10  THAT'S WHEN I KIND OF CRAWLED OVER HERE, BY THE FRONT DOOR.

11  I REMEMBER DOING THAT.  IT WAS HARD.

12  Q    AFTER THE BEATING STOPPED, YOU CRAWLED BACK TOWARD THE

13  FRONT DOOR?

14  A    YES.

15  Q    WHERE DID THE DEFENDANT GO THAT YOU SAW?

16  A    HE WENT BACK INTO THE APARTMENT, INTO HIS ROOM.

17  Q    DID YOU SEE HIM AGAIN AT ANY POINT?

18  A    YEAH, HE CAME BACK OUT.

19  Q    HOW LONG WAS HE GONE?

20  A    MAYBE A MINUTE.

21  Q    WHAT HAPPENED WHEN HE CAME BACK OUT A MINUTE AFTER THE

22  BEATING STOPPED?

23  A    I'D LIKE MADE IT TO HERE.

24  Q    YOU'RE POINTING OUT THE PICTURE, WHICH IS PEOPLE'S 8.

25  A    AND I WAS SITTIN' UP, AND HE STABBED ME.

26  Q    HOW DO YOU KNOW HE STABBED YOU?

27  A    BECAUSE I FELT IT.

28  Q    WHAT DID YOU FEEL?

1   Q      AND THOSE CONVERSATIONS HAVE HELPED YOU REMEMBER WHAT

2   HAPPENED THAT DAY; CORRECT?

3   A      WELL, THOSE CONVERSATIONS TOOK PLACE, YOU KNOW, MONTHS

4   AGO.  I HAVE HAD SOME RECOLLECTION ABOUT THE INCIDENT SINCE

5   THEN, YOU KNOW, JUST -- I DON'T KNOW, LIKE YOUR MEMORY GETS

6   BETTER SOMETIMES, SOMETIMES IT DOESN'T GET BETTER.

7   Q      SO OVER TIME YOUR MEMORY ABOUT THIS INCIDENT, THOUGH,

8   HAS ACTUALLY BEEN GETTING BETTER, THOUGH; CORRECT?

9   A      I BELIEVE SO.  I'M TRYING TO BE, YOU KNOW, ACCURATE.

10  Q      AND YOU'VE BEEN ABLE TO RECONSTRUCT IN YOUR MIND, YOU

11  KNOW, WHAT HAPPENED THAT DAY; CORRECT?

12  A      YEAH.  PRETTY MUCH, YEAH.

13  Q      AND SO NOW SITTING HERE TODAY YOU'VE GOT A PRETTY GOOD

14  MEMORY OF WHAT HAPPENED THAT DAY; RIGHT?

15  A      AS GOOD AS IT'S GOING TO GET, I BELIEVE.

16  Q      AND IN FACT YOUR MEMORY TODAY IS BETTER THAN YOUR

17  MEMORY WAS BACK IN OCTOBER WHEN YOU TESTIFIED AT THE

18  PRELIMINARY HEARING; RIGHT?

19  A      PROBABLY SO.

20  Q      AND IT'S DEFINITELY BETTER THAN IT WAS BACK IN AUGUST

21  SHORTLY AFTER THE INCIDENT; RIGHT?

22  A      THAT'S A DEFINITE.

23  Q      NOW, IN PREPARING FOR YOUR TESTIMONY TODAY YOU TALKED

24  TO MR. DEMERTZIS ABOUT THE INCIDENT, AND HE EXPLAINED THAT

25  HE WAS GOING TO ASK YOU QUESTIONS; RIGHT?

26  A      YEAH.

27  Q      AND YOU TALKED ABOUT THE QUESTIONS HE WAS GOING TO ASK

28  YOU, AND THEN YOU TOLD HIM THE ANSWERS YOU WERE GOING TO

1   Q    DO YOU REMEMBER ONE OF THE LADIES -- DO YOU REMEMBER

2   SITTING AT THE TABLE WITH THE LADIES?

3   A    YEAH.

4   Q    AND YOU HAD A PICNIC PLATE IN FRONT OF YOU; RIGHT?

5   A    POSSIBLY.  I DON'T REMEMBER EXACTLY WHAT WE HAD TO

6   EAT.

7   Q    DO YOU REMEMBER ONE OF THE LADIES GRABBING YOUR PICNIC

8   PLATE?

9   A    NO, I DON'T REMEMBER THAT.  COULD HAVE HAPPENED.

10  Q    COULD HAVE HAPPENED?

11  A    COULD HAVE.  LIKE I SAY, I DON'T REMEMBER.

12  Q    DO YOU REMEMBER ONE OF THE LADIES BEING SO UPSET WITH

13  YOU THAT SHE GRABBED YOUR PICNIC PLATE AND THREW IT AWAY

14  FROM THE TABLE AND TOLD YOU TO LEAVE?

15  A    MAYBE.  THAT MIGHT HAVE HAPPENED.  I DON'T REMEMBER,

16  TO TELL YOU THE TRUTH.

17  Q    AND THAT'S BASICALLY WHEN YOU DECIDED THAT, YOU KNOW,

18  IT WAS TIME TO GO?

19  A    BETTER HIT THE ROAD, YEAH.  I MIGHT HAVE GOT OUT OF

20  LINE.  CAN'T DENY THAT.  IT'S HAPPENED BEFORE.

21  Q    AND YOU WENT BACK TO JEFF'S AT THAT POINT; CORRECT?

22  A    YES.

23  Q    AND TWO OR THREE HOURS LATER JEFF CAME HOME; CORRECT?

24  A    YEAH, PROBABLY AROUND THEN.

25  Q    AND THAT WAS ABOUT TWILIGHT?

26  A    YEAH, MAYBE.  IT WAS AROUND THAT TIME.

27  Q    AND WHEN JEFF GOT HOME, YOU REMEMBER JEFF WALKING

28  AROUND THE CORNER OF THE APARTMENT?

1    A      YEAH, I REMEMBER HIM COMIN' UP.

2    Q      DO YOU REMEMBER SEEING HIM COMING UP THE WALKWAY?

3    A      YEAH.

4    Q      AND YOU WERE JUST SITTING THERE ON THE WALKWAY,

5    WAITING FOR HIM?

6    A      YEAH, THAT'S WHAT I REMEMBER.

7    Q      AND YOU HAD BEEN SITTING THERE FOR THE WHOLE TIME

8    WAITING --

9    A      I COULD HAVE BEEN SITTING THERE FOR TWO HOURS.  I --

10   YOU KNOW, I CAN'T TELL YOU EXACTLY.

11   Q      KICKING BACK, RELAXING?

12   A      YEAH, JUST SITTIN' THERE.  IT WAS A NICE EVENING.

13   Q      AND WHEN JEFF GOT HOME, YOU GUYS WENT INSIDE; CORRECT?

14   A      NO.  AS FAR AS I CAN REMEMBER WE DIDN'T AT THAT MOMENT

15   OF TIME.  KIND OF GOT IN A LITTLE VERBAL STUFF.  IT WASN'T

16   REALLY HEAVY, YOU KNOW.  I'D BEEN DRINKING AND HE'D BEEN

17   DRINKING AND JUST GOT -- YOU KNOW, IT ESCALATED INTO, YOU

18   KNOW, SOMETHING I WISH WOULD HAVE NEVER HAPPENED.

19   Q      DO YOU REMEMBER TESTIFYING EARLIER TODAY THAT WHEN

20   JEFF GOT HOME, YOU GUYS WENT INSIDE AND THEN CAME BACK

21   OUTSIDE?

22   A      I DON'T REMEMBER -- MAYBE I DID SAY THAT.  I DON'T

23   KNOW.

24   Q      DO YOU REMEMBER WHAT ACTUALLY HAPPENED?  DO YOU

25   REMEMBER IF YOU WENT INSIDE, ARE YOU CERTAIN THAT YOU DIDN'T

26   GO INSIDE, OR DO YOU NOT REMEMBER ONE WAY OR THE OTHER?

27   A      I'M KIND OF VAGUE ON THAT, TO TELL YOU THE TRUTH.

28   WHAT DIFFERENCE DOES IT MAKE IF I WENT IN, CAME BACK OUT?  I

1    DON'T UNDERSTAND WHAT YOU'RE DOING WITH THIS.

2    Q    I'M TRYING TO FIND OUT DO YOU REMEMBER WHETHER OR NOT

3    YOU WENT INSIDE THE HOUSE WITH JEFF AFTER JEFF GOT HOME FROM

4    THE PICNIC THAT NIGHT.

5    A    I CAN'T TELL YOU A HUNDRED PERCENT ON THAT.  MAYBE I

6    SAID I DID, BUT I DON'T REMEMBER, REALLY, EXACTLY.  I DO

7    REMEMBER GOING IN THERE AFTERWARDS, AFTER, YOU KNOW, THE

8    THING HAPPENED.

9    Q    BUT YOU DON'T HAVE ANY MEMORY ONE WAY OR THE OTHER

10   WHETHER OR NOT YOU WENT IN WITH JEFF BEFORE THE INCIDENT AND

11   AFTER THE PICNIC?

12   A    I MAY HAVE DONE THAT.

13   Q    DO YOU REMEMBER JEFF GIVING YOU A WASHCLOTH AND

14   TELLING YOU TO GO CLEAN UP YOUR FACE?

15   A    HE MIGHT HAVE DONE THAT.  I REALLY DON'T REMEMBER.  I

16   DON'T REMEMBER A WHOLE LOT AFTER THAT.

17   Q    AFTER THE PICNIC AND BEFORE THE FIGHT WITH JEFF DO YOU

18   REMEMBER HIM GIVING YOU A WASH CLOTH AND TELLING YOU TO GO

19   CLEAN UP?

20   A    NO.  I DON'T THINK THAT HAPPENED.

21   Q    AND IS IT THAT YOU DON'T REMEMBER OR YOU'RE SURE THAT

22   THAT DID NOT HAPPEN?

23   A    I'M SURE.

24   Q    YOU'RE WEARING GLASSES TODAY.  DO YOU TYPICALLY WEAR

25   GLASSES?

26   A    YES.

27   Q    WERE YOU WEARING YOUR GLASSES THE DAY OF THE INCIDENT?

28   A    MAYBE JUST TO READ, JUST READING GLASSES.

1           THE WITNESS:  AS FAR AS I CAN RECALL, NO.

2    Q    (BY MR. KURTZMAN)  AND EVENTUALLY THIS VERBAL

3    ALTERCATION BECAME PHYSICAL?

4    A    YEAH.

5    Q    JEFF'S HOUSE, HE'S GOT A WOODEN DOOR AND THEN A SCREEN

6    DOOR; RIGHT?

7    A    YEAH.

8    Q    IT WAS AUGUST, AND AT THAT POINT ONLY THE SCREEN DOOR

9    WAS CLOSED SO THE HOUSE COULD AIR OUT; RIGHT?

10    A    PROBABLY.

11    Q    TAKING ADVANTAGE OF THE TWILIGHT AND HOW IT WAS

12    COOLING OFF?

13    A    YEAH, PROBABLY SO.

14    Q    DO YOU REMEMBER THE WOODEN DOOR BEING OPEN AND THE

15    SCREEN DOOR CLOSED?

16    A    WHEN I FIRST GOT THERE, BOTH OF THOSE WERE CLOSED.

17    Q    RIGHT.  I'M TALKING ABOUT BEFORE THE FIGHT STARTED.

18    THE WOODEN DOOR WAS OPEN AND THE SCREEN DOOR WAS CLOSED?

19    A    I DON'T REMEMBER THAT.

20    Q    SO YOU HAD THE VERBAL ALTERCATION AND THEN IT BECAME

21    PHYSICAL; CORRECT?

22    A    YES.

23    Q    AND THIS IS ALL HAPPENING RIGHT THERE IN FRONT OF

24    JEFF'S DOOR; CORRECT?

25    A    THEREABOUTS.

26    Q    AND YOU DON'T KNOW, BUT YOU THINK YOU MAY HAVE THROWN

27    ONE PUNCH AT JEFF; CORRECT?

28    A    CORRECT.

1   Q    AND YOU HAVE MEMORY OF TRYING TO CRAWL IN THERE;

2   RIGHT?

3   A    YEAH.

4   Q    SO YOU DIDN'T STAND UP --

5   A    I THINK ONE OF THE NEIGHBORS CAME DOWN AT THAT TIME

6   AND HELPED ME.  I DON'T REMEMBER EVERYTHING ABOUT THAT

7   AFTERWARDS.

8   Q    SO IN BETWEEN THE TWO INCIDENTS YOU THINK ONE OF THE

9   NEIGHBORS CAME DOWN TO HELP YOU?

10  A    YEAH, YEAH.

11  Q    WHICH NEIGHBOR WAS THAT?

12  A    PETER.

13  Q    PETER?  OKAY.  AND PETER WAS HELPING YOU?

14  A    YES.

15  Q    AND AS WE'RE TALKING, SOUNDS LIKE THE MEMORY IS COMING

16  BACK TO YOU A LITTLE MORE CLEARLY.

17  A    YES, SOMEWHAT, YEAH.

18  Q    SO NOW YOU'RE FAIRLY CONFIDENT THAT IN BETWEEN THE TWO

19  INCIDENTS PETER CAME DOWN AND HELPED YOU; RIGHT?

20  A    YEAH.

21  Q    AND THEN MR. HANCOCK CAME BACK OUT?

22  A    I THINK THAT'S WHEN HE CAME OUT AND GAVE ME A

23  WASHCLOTH.  I THINK THAT'S WHAT YOU WERE REFERRING TO

24  EARLIER.

25  Q    SO MR. HANCOCK ACTUALLY CAME OUTSIDE AND GAVE YOU A

26  WASHCLOTH?

27  A    THAT WAS INSIDE, WHAT I REMEMBER.  HE MAY HAVE COME

28  OUTSIDE.  I DON'T THINK SO, THOUGH.  I THINK HE CAME OUT AND

1   HE WENT BACK IN HIS ROOM AND THE PARAMEDICS CAME AND ALL

2   THAT.

3   Q    THE SECOND TIME MR. HANCOCK CAME OUT OF THE APARTMENT,

4   DO YOU REMEMBER SEEING HIM COME OUT OF THE APARTMENT?

5   A    YOU KNOW, I THINK I HAD MY BACK TURNED.  BUT HE DID

6   COME OUT, BUT I DON'T REMEMBER WATCHING, YOU KNOW, VISIBLY

7   SEEING HIM COME OUT.  I DON'T REMEMBER THAT.

8   Q    YOU HAD YOUR BACK TO THE DOOR OF THE APARTMENT?

9   A    YEAH, I THINK SO.

10  Q    WHEN MR. HANCOCK CAME OUT OF THE APARTMENT, YOU THINK

11  -- THE SECOND TIME YOU THINK YOU HAD YOUR BACK TO THE DOOR?

12  A    I DON'T BELIEVE SO.

13  Q    AND THIS WAS BEFORE YOU WERE STABBED; CORRECT?

14  A    YES.

15  Q    SO YOU WERE TRYING TO CRAWL TOWARD THE APARTMENT, AND

16  THEN MR. HANCOCK CAME OUT; CORRECT?

17  A    YES.

18  Q    AND WHEN MR. HANCOCK CAME OUT, HE JUST WALKED RIGHT UP

19  AND STABBED YOU; CORRECT?

20  A    I'M PRETTY SURE THAT'S HOW THAT HAPPENED.

21  Q    YOU'RE PRETTY SURE.  YOU HAVE SOME DOUBTS NOW?

22  A    NO.  THAT'S WHAT HAPPENED.

23  Q    AND YOU WERE SITTING ON THE GROUND OR LAYING ON THE

24  GROUND WHEN THIS HAPPENED?

25  A    NO, I WAS SITTIN' UP, I THINK.

26  Q    WITH YOUR BACK TO THE DOOR?

27  A    YEAH.

28  Q    AND MR. HANCOCK CAME UP FROM BEHIND AND STABBED YOU;

1   WOUND ON YOUR HAND?

2   A      YES.

3   Q      AND YOU SAID THAT WAS ANOTHER STAB WOUND, DIDN'T YOU?

4   A      YES.

5   Q      THAT WAS FROM THE SAME KNIFE, WASN'T IT?

6   A      YES, I GUESS.  YEAH.

7   Q      DO YOU REMEMBER CLEARLY?

8   A      I JUST REMEMBER GOING LIKE THIS, KIND OF DEFENDING

9   MYSELF.  GOT NICKED ON THE HAND THERE.  NOTHING REAL

10  SERIOUS.

11  Q      AND THAT WAS AFTER YOU WERE STABBED IN THE BACK,

12  RIGHT?

13  A      YEAH.

14  Q      AND SO AFTER YOU WERE STABBED IN THE BACK, JEFF CAME

15  AROUND IN FRONT OF YOU AND ATTACKED YOU AGAIN WITH THE

16  KNIFE; RIGHT?

17  A      I DON'T REMEMBER THAT.  I COULD HAVE BEEN TURNIN' OR

18  (INDICATING) --

19  Q      WELL, UP UNTIL NOW YOU'VE ALWAYS TESTIFIED THAT YOU

20  HAD YOUR HANDS UP IN FRONT OF YOUR FACE.

21  A      RIGHT.  SO HE COULD HAVE BEEN IN FRONT OF ME, YEAH.

22  Q      DO YOU REMEMBER JEFF COMING AROUND THE FRONT OF YOU?

23  A      NOT EXACTLY.  LIKE I SAID, I DIDN'T SEE ANY WEAPON

24  SO --.

25  Q      DO YOU REMEMBER ADDITIONAL ATTACKS AFTER YOU WERE

26  STABBED IN THE BACK?

27  A      NO.  IT ENDED THERE.

28  Q      IT ENDED THERE?

1    A    YES.

2    Q    AND YET YOU'RE SAYING THAT YOU GOT AN ADDITIONAL STAB

3    WOUND ON YOUR HAND AFTER YOU WERE STABBED IN THE BACK;

4    RIGHT?

5    A    RIGHT.

6    Q    WHO GAVE YOU THE ADDITIONAL STAB WOUND IN THE HAND?

7    A    I WAS TRYING TO FIGHT OFF JEFF.  I THOUGHT HE WAS

8    GOING TO START DOING SOMETHING ELSE, SOMETHING.

9    Q    BUT YOU'VE JUST TESTIFIED MULTIPLE TIMES THAT JEFF

10   STABBED YOU IN THE BACK AND IMMEDIATELY WENT BACK INTO THE

11   HOUSE; CORRECT?

12   A    NO, I DIDN'T SAY THAT.

13   Q    WHAT DID YOU DO AFTER YOU GOT STABBED IN THE BACK?

14   A    GOT INSIDE THE APARTMENT.  I BELIEVE PETE HELPED ME

15   GET IN THERE, AND THOSE GUYS HELPED CLEANING ME OFF AND

16   CALLING THE PARAMEDICS.

17   Q    AND PETE HELPED YOU BACK INTO JEFF'S APARTMENT;

18   CORRECT?

19   A    I THINK THAT'S HOW IT HAPPENED.  YOU'D HAVE TO ASK

20   PETE.  HE WOULD KNOW.

21   Q    DO YOU REMEMBER IF YOU WALKED, IF PETE CARRIED YOU,

22   HOW YOU GOT BACK INTO THE APARTMENT?

23   A    WELL, I KNOW I DIDN'T WALK.  HE MIGHT HAVE LIFTED ME

24   UP OR -- I DON'T KNOW, CARRIED ME IN OR --.  I JUST DON'T

25   REALLY REMEMBER A WHOLE LOT ABOUT THAT LAST PART OF IT

26   THERE, JUST BITS AND PIECES.

27   Q    DO YOU REMEMBER WHERE YOU WERE IN JEFF'S APARTMENT

28   WHEN YOU WENT INSIDE?

1    A     I THINK I WAS IN THE FRONT ROOM.

2    Q     IN THE FRONT ROOM?

3    A     YEAH, IN THE FRONT ROOM.

4    Q     AND YOU REMEMBER IT WAS ACTUALLY ONE OF THE PARAMEDICS

5    WHO TOLD YOU THAT YOU HAD BEEN STABBED?

6    A     I DON'T REMEMBER THAT.

7    Q     DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

8    THAT IT WAS THE HOSPITAL PARAMEDICS WHO TOLD YOU YOU'D BEEN

9    STABBED?

10   A     THEY MAY HAVE SAID THAT.  PROBABLY DID.

11   Q     AND I'M ASKING YOU IS THAT HOW YOU LEARNED YOU WERE

12   STABBED?

13   A     I BELIEVE PETE WAS THE FIRST PERSON TO TELL ME THAT.

14   Q     DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

15   THAT IT WAS THE PARAMEDICS AT THE HOSPITAL THAT TOLD YOU YOU

16   HAD BEEN STABBED?

17   A     VAGUELY.  THEY PROBABLY DID.  I WAS PRETTY HAZED OUT

18   AT THAT TIME.

19   Q     AND THAT WAS YOUR MEMORY AT THE PRELIMINARY HEARING

20   WHEN YOU TESTIFIED?

21   A     I'M SORRY, I DIDN'T UNDERSTAND THE QUESTION.

22   Q     THAT WAS THE MEMORY YOU HAD AT THE PRELIMINARY HEARING

23   WHEN YOU TESTIFIED, WAS THAT THE PARAMEDICS AT THE HOSPITAL

24   ARE THE ONES THAT TOLD YOU YOU HAD BEEN STABBED; CORRECT?

25   A     YEAH, THAT'S PROBABLY CORRECT.

26   Q     NOW, YOU'VE HAD OCCASIONS WHEN YOU HAVE BEEN

27   INTOXICATED TO THE POINT WHERE YOU HAVE FALLEN DOWN;

28   CORRECT?

1 A YES, AND A FEW OF THEM.

2 Q AND IN FACT ONE OF THESE OCCASIONS HAPPENED ABOUT

3 THREE DAYS BEFORE THIS INCIDENT; CORRECT?

4 A I DON'T RECALL.

5 Q DO YOU REMEMBER BEING IN THE APARTMENT AND FALLING

6 WHEN YOU WERE AT THE BATHROOM DOOR ABOUT THREE DAYS BEFORE

7 THIS INCIDENT?

8 A IT MAY HAVE HAPPENED.

9 Q AND WHEN YOU FELL, YOU ACTUALLY HIT THE CORNER OF THE

10 MARBLE COUNTERTOP IN THE BATHROOM.  DO YOU REMEMBER THAT?

11 A YEAH, I KIND OF DO REMEMBER THAT.

12 Q AS YOU WERE FALLING, YOU SLAMMED INTO THE MARBLE

13 COUNTERTOP IN THE BATHROOM?

14 A I MAY HAVE.

15 Q AND YOU ACTUALLY HIT IT HARD ENOUGH THAT IT ACTUALLY

16 SHIFTED.  DO YOU REMEMBER THAT?

17 A PROBABLY.

18 Q IT ACTUALLY SHIFTED WITH ENOUGH FORCE THAT IT ACTUALLY

19 HAD TO HAVE SOME WORK DONE TO REPAIR SOME OF THE -- TO

20 REPAIR THE FAUCET.  DO YOU REMEMBER THAT?

21 A NO.

22 Q DID YOU EVER TAKE A LOOK AT IT AFTER IT SHIFTED?

23 A NO.

24 Q DO YOU REMEMBER WHAT PART OF YOUR BODY HIT THE MARBLE

25 COUNTERTOP WHEN YOU FELL?

26 A IT WAS EITHER MY BACK OR MY HIP.

27 Q WAS IT -- IT WAS YOUR TORSO?

28 A COULD HAVE BEEN.

1  DAY, HE HAD A PINT OF VODKA THAT YOU GUYS SHARED?

2  A    NO, I DON'T REMEMBER THAT.  COULD HAVE BUT I DON'T --

3  I DON'T REMEMBER, SORRY.  IT'S A POSSIBILITY.

4  Q    SO YOU HAVE NO MEMORY ONE WAY OR THE OTHER.  YOU DON'T

5  SPECIFICALLY REMEMBER IT NOT HAPPENING, YOU JUST DON'T

6  REMEMBER IT HAPPENING; CORRECT?

7  A    CORRECT.

8  Q    DO YOU HAVE ANY MEMORY OF GOING INSIDE MR. HANCOCK'S

9  APARTMENT AFTER HE CAME BACK FROM THE PARK TO DRINK THE

10  VODKA?

11  A    NO, I DON'T.

12       THE COURT:  LADIES AND GENTLEMEN, LET'S TAKE A

13  LITTLE STRETCH BREAK RIGHT HERE FOR 30 SECONDS OR SO.

14       GO AHEAD.

15  Q    (BY MR. KURTZMAN)  DO YOU REMEMBER TELLING OFFICER KIM

16  THAT YOU WERE SLEEPING IN FRONT OF MR. HANCOCK'S APARTMENT

17  WHEN HE CAME HOME?

18  A    VAGUELY.

19  Q    AND DO YOU REMEMBER TELLING OFFICER KIM THAT WHEN

20  MR. HANCOCK GOT HOME, YOU TOLD HIM YOU NEEDED TO GET SOME

21  PAPERS OUT OF HIS APARTMENT?

22  A    NO.  YOU KNOW, I DON'T REMEMBER THAT.

23  Q    YOU DON'T REMEMBER THAT OR YOU DIDN'T SAY IT?

24  A    I MAY HAVE SAID IT.  I JUST DON'T REMEMBER -- I DON'T

25  HAVE LIKE TOTAL RECALL OF THAT NIGHT.

26  Q    DO YOU REMEMBER TELLING OFFICER KIM THAT YOU IN FACT

27  DID GO INSIDE THE APARTMENT TO GET THE PAPERS?

28  A    NO.

1    A    WELL, IT WAS A PUNCTURE WOUND.  WHERE ELSE WOULD IT

2    COME FROM?

3    Q    DO YOU SPECIFICALLY REMEMBER BEING STABBED IN THE HAND

4    WITH THE KNIFE DURING THE INCIDENT?

5    A    I REMEMBER HOLDING UP MY HANDS, YOU KNOW, AND SOME

6    PAIN IN THERE AFTERWARDS.  LIKE I SAID BEFORE, I DIDN'T SEE

7    ANY WEAPON, SO --.  IF I DID, I DON'T REMEMBER THAT EITHER.

8    IT WAS PRETTY FOGGY.

9    Q    WHEN YOU TESTIFIED AT THE PRELIMINARY HEARING ABOUT

10   RECEIVING THE WOUND TO YOUR HAND, DID YOU TELL THE TRUTH?

11   A    YES.

12   Q    AND DO YOU REMEMBER PREVIOUSLY TESTIFYING THAT YOU DID

13   NOT REMEMBER HOW YOU RECEIVED THE WOUNDS ON YOUR HAND?

14   A    I MAY HAVE SAID THAT.

15   Q    OKAY.  AND YOU WERE TELLING THE TRUTH THEN?

16   A    YEAH.

17   Q    OKAY.  SO BACK IN OCTOBER YOU DID NOT REMEMBER OR DID

18   NOT KNOW HOW YOU RECEIVED THE WOUND ON YOUR HAND; RIGHT?

19   A    I GUESS YOU COULD ASSUME THAT.

20   Q    THAT'S WHAT YOU TESTIFIED TO UNDER OATH; RIGHT?

21   A    RIGHT.  I WAS TELLING THE TRUTH --

22   Q    AND NOW TODAY --

23   A    -- YOU KNOW --

24   Q    NOW TODAY YOU SPECIFICALLY REMEMBER THE KNIFE CUTTING

25   YOUR HAND; RIGHT?

26   A    SOMETHING SHARP, YES.

27   Q    COULD IT HAVE BEEN THE BUSH?

28   A    I DON'T THINK SO.

1    Q    COULD IT HAVE BEEN ANYTHING OTHER THAN THE KNIFE?

2    A    I DON'T BELIEVE SO.

3    Q    SO TODAY YOU REMEMBER IT BEING THE KNIFE, BUT YOU

4    DIDN'T REMEMBER IN OCTOBER; RIGHT?

5    A    PARDON ME?

6    Q    TODAY YOU REMEMBER IT BEING THE KNIFE THAT CUT YOUR

7    HAND, BUT YOU DID NOT REMEMBER THAT IN OCTOBER; CORRECT?

8    A    YEAH, THAT WOULD PROBABLY BE CORRECT.

9    Q    NOW, AFTER YOU WERE STABBED IN THE BACK, DID YOU ROLL

10    AROUND WITH JEFF AND WRESTLE WITH JEFF?

11    A    NO, I DON'T THINK THERE WAS ANY OF THAT GOING ON AFTER

12    THAT.

13    Q    WERE YOU ROLLING AROUND AND WRESTLING WITH JEFF WHEN

14    YOU FELT THE PAIN IN YOUR HAND?

15    A    NO, JUST TRYING TO HOLD MY ARMS UP AND ASKING JEFF,

16    YOU KNOW, WHAT'S GOIN' ON.  YOU KNOW.

17    Q    DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

18    THAT YOU WERE ROLLING AROUND THERE ON THE CONCRETE AND "I

19    DID FEEL A SHARP PAIN IN MY HAND"?  DO YOU REMEMBER

20    TESTIFYING TO THAT?

21    A    I PROBABLY DID SAY THAT.

22    Q    AND THAT WAS THE TRUTH?

23    A    YEAH.  I HAVE NO REASON TO LIE ABOUT IT.

24    THE COURT:  YOU HAVE TO SPEAK UP.  WHAT WAS THE

25    LAST COMMENT YOU MADE?

26    THE WITNESS:  I'M SORRY.  OH.  I DON'T HAVE ANY

27    REASON TO LIE ABOUT THAT INCIDENT.

28    Q    (BY MR. KURTZMAN)  AND WHEN YOU HAD YOUR VERBAL

1    A    PETE.

2    Q    AND SOMEONE ELSE?

3    A    I THINK NEAL CAME DOWN, TOO.

4    Q    ALL RIGHT.  WHOEVER IT WAS, DO YOU REMEMBER WHAT

5    EXACTLY THEY DID FOR YOU IN TERMS OF CLEANING YOU UP?

6    A    THEY HELD A TOWEL OR TISSUES OR SOMETHING ON MY BACK

7    AND, YOU KNOW, I THINK THEY PUT A WET CLOTH ON MY FACE.

8    Q    THESE FELLAS BROUGHT YOU BACK INTO JEFF'S APARTMENT?

9    A    I'M PRETTY SURE PETE DID, I THINK.  I DON'T KNOW, I

10   MAY HAVE CRAWLED IN THERE.  I DON'T REMEMBER THAT A HUNDRED

11   PERCENT.

12   Q    FAIR ENOUGH.  COULD YOU HAVE BEEN TAKEN INTO THE

13   KITCHEN?

14   A    POSSIBLY.

15   Q    SO IF YOUR BLOOD WAS IN THE KITCHEN, MAYBE SOMEONE

16   TOOK YOU THERE, OR MAYBE YOU WENT THERE YOURSELF?

17   A    IT'S A POSSIBILITY TOO.

18   Q    YOU JUST DON'T REMEMBER CLEARLY?

19   A    NO.

20   Q    SIR, WHEN I WAS ASKING YOU QUESTIONS EARLIER, YOU

21   STARTED TO SAY SOMETHING ABOUT NOT CONTRIBUTING TO THE

22   APARTMENT OR NOT HELPING OUT -- I CAN'T REMEMBER WHAT IT

23   WAS -- AND WE MOVED ON.

24        AND I JUST WANT YOU TO EXPLAIN MORE TO THE JURY.  I

25   DON'T EVEN KNOW WHAT YOU WERE TRYING TO SAY.  WERE YOU DOING

26   SOMETHING OR CLOSER TO THE TRUTH NOT DOING SOMETHING THAT

27   YOU SAY ANNOYED JEFF?

28   A    YEAH.  I WASN'T HOLDING MY OWN.  I WASN'T PAYING RENT,

```
1    AND OUT OF THE GOODNESS OF HIS HEART HE LET ME STAY THERE.

2    BECAUSE I WAS PRETTY MUCH OUT OF WORK.  I HAD A LITTLE

3    PART-TIME JOB BUT --.

4    Q    WOULD THE DEFENDANT LET YOU KNOW ABOUT IT?  WOULD HE

5    EVER SAY THINGS TO YOU LIKE WHY DON'T YOU CHIP IN --

6    A    YEAH.

7    Q    -- OR AT LEAST BUY YOUR OWN SMOKES, OR THINGS LIKE

8    THAT?

9    A    YES.

10   Q    HOW LONG HAD THAT BEEN GOING ON?

11   A    I DON'T KNOW THE EXACT TIME, BUT IT HAD BEEN GOING ON

12   FOR A WHILE.  JEFF WAS GETTING KIND OF PISSED OFF AT ME,

13   EXCUSE MY LANGUAGE.  I DON'T BLAME HIM AT ALL.

14   Q    OTHER THAN CONTRIBUTING RENT OR EATING HIS FOOD OR --

15   I DON'T KNOW WHAT ELSE -- IS THERE ANYTHING ELSE THAT YOU

16   THINK MAYBE ANNOYED THE DEFENDANT?  I MEAN BIGGER THAN THAT.

17   DID YOU EVER STEAL FROM HIM, FOR INSTANCE?

18   A    NO, I NEVER.

19   Q    SO IT'S JUST YOU BEING KIND OF A DEADBEAT AROUND THE

20   APARTMENT?

21   A    YES.

22   Q    I DON'T MEAN TO EMBARRASS YOU --

23   A    IT'S EMBARRASSING.  YEAH, THAT'S THE TRUTH.

24   Q    -- BUT LET'S CALL A ROSE A ROSE.

25   A    YEAH.

26   Q    DID YOU GET THE IMPRESSION THAT WHAT HAPPENED ON

27   AUGUST 7TH WAS KIND OF EVERYTHING COMING TO A HEAD?

28         MR. KURTZMAN:  OBJECTION, LEADING, SPECULATION.
```

1    A    IT MAY HAVE BEEN.  I'M NOT A HUNDRED PERCENT POSITIVE,

2    BUT IT'S -- MOST LIKELY, SEEMS TO ME.

3    Q    LET ME ASK YOU A MORE DIRECT QUESTION.  WERE YOU

4    TELLING ME THE TRUTH EARLIER TODAY ABOUT WHAT HAPPENED THAT

5    DAY?

6    A    OH, YES.

7    Q    SO WHEN JEFF CAME BACK OUT OF THE APARTMENT, YOU DID

8    FEEL A SHARP PAIN?

9    A    YES.

10   Q    AND YOU DID THINK THAT YOU GOT STABBED?

11   A    YES.

12   Q    NOW, YOU HESITATED FOR A MOMENT.  WHY DID YOU

13   HESITATE?

14   A    YOU KNOW, WHEN IT HAPPENED I JUST COULDN'T BELIEVE

15   THIS WAS HAPPENING.  I DIDN'T WANT TO BELIEVE IT.

16   Q    AND YOU KNEW THAT IT WAS JEFF THAT JUST STABBED YOU?

17   A    YEAH.

18        MR. DEMERTZIS:  ALL RIGHT, MR. DAVIS.  THANK YOU.

19        THE COURT:  RECROSS?

20        MR. KURTZMAN:  THANK YOU, YOUR HONOR.

21                   RECROSS-EXAMINATION

22   Q    (BY MR. KURTZMAN)  MR. DAVIS, WHEN MR. DEMERTZIS A

23   MINUTE AGO RESTATED MY QUESTION ABOUT PETER BEING THE FIRST

24   ONE TO TELL YOU YOU WERE STABBED AND THAT BEING THE FIRST

25   TIME YOU REALIZED YOU WERE STABBED, YOU ANSWERED HIM YEAH,

26   THAT THAT'S HOW YOU REMEMBER IT; RIGHT?

27   A    WELL, LIKE I SAID, I DON'T REMEMBER A HUNDRED PERCENT,

28   BUT I'M PRETTY SURE THAT'S WHAT HAPPENED.

1    Q    AND THEN AS MR. DEMERTZIS ASKED THE QUESTION A COUPLE

2    MORE TIMES, YOUR RESPONSES CAME AROUND TO YOU KNEW YOU WERE

3    STABBED RIGHT AWAY; RIGHT?

4    A    YEAH.

5    Q    SO BASICALLY YOUR ANSWERS EVOLVED AS MR. DEMERTZIS

6    PROGRESSED THROUGH HIS QUESTIONS; RIGHT?

7    A    PARDON ME?

8    Q    YOUR ANSWER CHANGED AS MR. DEMERTZIS WENT THROUGH HIS

9    LINE OF QUESTIONS; RIGHT?

10   A    NO, I DON'T THINK SO.

11   Q    YOU'VE TOLD ME THAT THE FIRST TIME YOU REALIZED YOU

12   WERE STABBED WAS WHEN PETER TOLD YOU; RIGHT?

13   A    YEAH, I BELIEVE THAT'S CORRECT.

14   Q    YOU'VE ALSO TESTIFIED THAT THE FIRST TIME YOU REALIZED

15   YOU WERE STABBED WAS WHEN THE PARAMEDICS TOLD YOU AT THE

16   HOSPITAL; RIGHT?

17   A    I MAY HAVE SAID THAT.

18   Q    AND YOU'VE ALSO SAID THAT YOU KNEW YOU WERE STABBED

19   RIGHT AWAY; RIGHT?

20   A    YEAH, I FELT IT.

21   Q    SO YOU'VE GIVEN THREE DIFFERENT ANSWERS TO THAT

22   QUESTION, BASICALLY; RIGHT?

23   A    THREE DIFFERENT QUESTIONS ASKED.

24   Q    OKAY.  MR. DAVIS, YOU'VE LIED UNDER OATH; RIGHT?

25   A    YEAH, I BENT THE TRUTH THERE.

26   Q    AND YOU FEEL VERY GUILTY THAT MR. HANCOCK IS SITTING

27   HERE NEXT TO ME, DON'T YOU?

28   A    YEAH, I DO.

1    THINGS LIKE THAT.

2    Q    SO YOU'RE STANDING IN THE DOORWAY, AND CRAIG IS

3    SITTING ON A CHAIR APPROXIMATELY WHERE?

4    A    CENTER OF THE ROOM TOWARDS THE RIGHT-HAND SIDE, SO IT

5    WOULD BE ABOUT FOUR FEET AWAY FROM THE DOOR.

6    Q    OTHER THAN THE INJURIES YOU'VE ALREADY TOLD US ABOUT

7    DID YOU SEE ANY OTHER INJURIES ON CRAIG'S BODY?

8    A    WELL, DUNCAN HAD A RAG THAT HE HAD AT CRAIG'S LOWER

9    LEFT-HAND PORTION OF HIS BACK, THE SMALL -- RIGHT DOWN THE

10   LEFT SIDE, SMALL OF HIS BACK, THAT HE WAS HOLDING AGAINST

11   HIM, AND THERE WAS A STAB WOUND.

12   Q    YOU'RE NOT A DOCTOR IN ADDITION TO BEING A CARPENTER?

13   A    NO.

14   Q    HAVE YOU EVER SEEN A STAB WOUND BEFORE?

15   A    NO.

16   Q    SO WHY DO YOU SAY IT'S A STAB WOUND?

17   A    BASED ON A CONVERSATION WITH JEFF.

18   Q    WE'LL GET TO THAT IN A MINUTE.  SO THIS WOUND THAT YOU

19   SAW ON CRAIG'S BACK, DESCRIBE IT OTHER THAN A STAB WOUND.

20   WHAT DID IT LOOK LIKE?

21   A    IT WAS A -- ABOUT A ONE-INCH LONG VERTICAL CUT THAT

22   WAS DEEP ENOUGH SO I COULDN'T SEE HOW DEEP IT WAS.

23   Q    HOW CLOSE DID YOU GET TO IT?

24   A    VERY CLOSE.  CLOSE ENOUGH TO TAKE A GOOD LOOK AT IT.

25   I WANTED TO KNOW HOW DEEP IT WAS TO MAKE A DECISION AS TO

26   WHETHER OR NOT WE SHOULD GET CRAIG AN AMBULANCE.

27   Q    SIX INCHES?

28   A    ROUGHLY.

1   Q    DID YOU ASK CRAIG WHAT HAPPENED?

2   A    YES.

3   Q    WHAT DID HE TELL YOU?

4   A    CRAIG TOLD ME THAT HE GOT ROLLED IN THE PARK, FAIR

5   OAKS PARK.

6   Q    DID YOU BELIEVE HIM?

7   A    NO.

8   Q    WHY NOT?

9   A    JEFF HAD COMBATIVE INJURIES TO HIS HANDS.

10  Q    JEFF, THE DEFENDANT?

11  A    YES.

12  Q    OKAY.  TELL US ABOUT THAT.

13  A    HIS HANDS WERE SWOLLEN AND CUT UP.  IT LOOKED LIKE

14  HE'D BEEN BEATING ON CRAIG, WHICH --

15  Q    WELL, BEATING ON SOMETHING?

16  A    YEAH.

17  Q    YOU DIDN'T KNOW AT THAT POINT.  TELL US IN DETAIL AS

18  BEST YOU CAN, SIR, WHAT YOU OBSERVED ON THE DEFENDANT'S

19  HANDS.

20  A    I JUST DID.  HIS KNUCKLES WERE SWOLLEN RED AND SOME

21  MINOR CUTS.

22  Q    BASED ON WHAT YOU OBSERVED ON JEFF YOU DIDN'T BELIEVE

23  CRAIG'S STORY THAT HE GOT ROLLED IN THE PARK?

24  A    NO, I DID NOT.

25  Q    IS THERE ANYTHING ELSE THAT MADE YOU SUSPECT THAT

26  CRAIG WAS NOT TELLING THE TRUTH?

27  A    CRAIG WAS VERY DEPENDENT ON JEFF, SO HE WOULD COVER

28  FOR HIM IN A SITUATION LIKE THAT.

1    ADAMANTLY OPPOSED -- BOTH OF THEM WERE ADAMANTLY OPPOSED TO

2    HAVING THE PARAMEDICS ARRIVE.

3    Q     YOU WEREN'T IN THE COURTROOM, BUT WE KNOW THAT IN FACT

4    PARAMEDICS DID ARRIVE.

5    A     YES.

6    Q     AND YOU WERE THERE, SO YOU WOULD KNOW BETTER THAN ANY

7    OF US.  BUT HOW IS IT THAT PARAMEDICS WERE SUMMONED?  WHAT

8    HAPPENED AFTER YOU SAID WE GOT TO CALL AN AMBULANCE, AND

9    THEY SAID, NO, NO, WE DON'T WANT TO INVOLVE THEM?

10   A     BOTH CRAIG AND JEFF WERE ADAMANTLY OPPOSED TO HAVING

11   THE PARAMEDICS COME, BUT DUNCAN, THE OTHER GENTLEMAN WHO WAS

12   THERE, AND I CONVINCED THEM THAT CRAIG NEEDED MEDICAL

13   ATTENTION.  BECAUSE OF THE DEPTH OF THE WOUND HE COULD HAVE

14   INTERNAL BLEEDING OR DAMAGE TO A MAJOR ORGAN.

15        SO AFTER SOME CONVINCING FROM BOTH DUNCAN AND MYSELF

16   THEY DECIDED TO ALLOW IT, SO HE CALLED THE PARAMEDICS ON MY

17   CELL PHONE.

18   Q     HOW LONG AFTER YOU PLACED THAT CALL THAT THE

19   PARAMEDICS IN FACT ARRIVED?

20   A     I DON'T KNOW THE EXACT TIME.  I'D ESTIMATE FIVE TO

21   SEVEN MINUTES, MAYBE.

22   Q     DID YOU MAKE A CALL OUT IN THE LIVING ROOM IN VIEW OF

23   THE DEFENDANT?

24   A     I'M NOT SURE IF I WAS STANDING INSIDE OR STANDING OUT

25   FRONT.

26   Q     WELL, WHILE YOU'RE CALLING THE PARAMEDICS, WHAT WAS

27   THE DEFENDANT DOING, IF YOU KNOW?

28   A     AT THE TIME I WAS CALLING THE PARAMEDICS I COULDN'T

1   TELL YOU WHAT HE WAS DOING.

2   Q     DID YOU SEE HIM AFTER YOU GOT OFF THE PHONE?

3   A     WELL, HE WAS IN THE APARTMENT, AND DUNCAN AND I BOTH

4   SUGGESTED THAT HE LEAVE BEFORE THE PARAMEDICS ARRIVED.

5   Q     WHY DID YOU SUGGEST THAT?

6   A     WELL, IN THE CITY OF SUNNYVALE PARAMEDICS ARE ALSO

7   POLICE OFFICERS, SO WE THOUGHT IT WOULD BE BETTER FOR HIM IF

8   HE WASN'T AROUND WHEN THE PARAMEDICS ARRIVED.

9   Q     BECAUSE HE MIGHT GET IN TROUBLE?

10   A     YES.

11   Q     DID THE DEFENDANT LEAVE?

12   A     NO.

13   Q     WHAT HAPPENED?

14   A     HE DIDN'T WANT TO LEAVE, (SO WE SUGGESTED THAT HE WAIT

15   IN THE BEDROOM AND CLOSE THE DOOR, AND HE AGREED TO DO THAT.)

16   Q     SO THE LAST THING YOU SAW THE DEFENDANT DO WAS GO IN

17   HIS BEDROOM AND CLOSE THE DOOR BEHIND HIM?

18   A     THAT IS CORRECT.

19   Q     LET'S JUMP BACK TO THE KNIFE FOR A SECOND.  WAS THE

20   DEFENDANT TELLING YOU THAT THIS IS THE KNIFE I USED?

21   A     I'M NOT SURE IF HE WAS TELLING ME THAT OR NOT.  THAT'S

22   THE IMPRESSION THAT I GOT.

23   Q     COULD HE HAVE BEEN -- I WASN'T THERE SO I'M ASKING

24   YOU -- COULD HE HAVE BEEN JUST DEMONSTRATING WITH ANY KNIFE

25   THAT HE GRABBED?

26   A     QUITE POSSIBLY, YES.

27   Q     LAST QUESTION, SIR.  DID ANYONE THERE -- YOU, CRAIG,

28   THIS DUNCAN FELLOW, THE DEFENDANT, ANYONE -- SAY THAT

1    MR. DUNCAN BUT SOMEONE ELSE IN THE APARTMENT.  HOW DID YOU

2    BECOME AWARE OF THIS OTHER PERSON IN THE APARTMENT?

3    A     MR. DAVIS WAS SITTING IN A CHAIR APPROXIMATELY WHERE

4    LIEUTENANT WRIGHT IS THERE.  THERE WAS A CHAIR THERE HE WAS

5    SITTING IN.  THE DOOR IS DIRECTLY ON THE OTHER SIDE OF HIM.

6    THE DOOR WAS CLOSED, SO IT'S AN UNKNOWN AREA FOR US.  SO I

7    WAS STANDING BETWEEN THE DOOR AND MR. DAVIS WHEN I HEARD

8    NOISES IN THAT BACK ROOM.

9    Q     CAN YOU DESCRIBE THE NOISES?

10   A     IT JUST SOUNDED LIKE THERE WAS SOMEONE IN THERE.

11   Q     WHAT DID YOU DO WHEN YOU HEARD THAT?

12   A     AS I HEARD IT, THE DOOR STARTED TO COME OPEN, AND THEN

13   THAT'S WHEN I BLOCKED THE DOOR FROM OPENING UP ONTO US WITH

14   MY FOOT.  A GENTLEMAN -- OR A MALE VOICE FROM BEHIND THE

15   DOOR, YELLED SOMETHING LIKE "WHAT THE FUCK?"  I IDENTIFIED

16   MYSELF AS SUNNYVALE POLICE AND CONTINUED TO BLOCK THE DOOR

17   FROM IT OPENING.

18   Q     WHAT HAPPENED NEXT?

19   A     THE DOOR CLOSED AND THEN SECONDS LATER SLAMMED OPEN

20   AGAIN BACK ONTO ME.

21   Q     DID YOU LOOK INSIDE THAT ROOM?

22   A     YES.  THE SECOND TIME IT OPENED UP, WE HELD THE DOOR

23   OPEN.  IT WAS OPEN APPROXIMATELY FOUR INCHES.  I INSTRUCTED

24   THE SUBJECT TO STEP BACK AWAY FROM THE DOOR.  OFFICER

25   ZARRIELLO AND I THEN ENTERED THAT ROOM AND HAD THE SUBJECT

26   SIT DOWN.

27   Q     THERE WAS ONLY ONE PERSON IN THAT ROOM --

28   A     YES.

1          MR. DEMERTZIS:  THANK YOU.

2       YOUR HONOR, AT THIS TIME THE PEOPLE MOVE TO HAVE

3   EXHIBIT 2 ADMITTED INTO EVIDENCE.

4          THE COURT:  ANY OBJECTION?

5          MR. KURTZMAN:  352, YOUR HONOR.  THIS WAS ONE OF

6   THE TWO --

7          THE COURT:  THE OBJECTION IS OVERRULED.

8          (WHEREUPON, PEOPLE'S EXHIBIT NUMBER 2, HAVING BEEN

9   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS RECEIVED IN

10  EVIDENCE.)

11  Q    (BY MR. DEMERTZIS)  THIS IS THE PICTURE YOU JUST

12  LOOKED AT THAT WE'RE PROJECTING ONTO THE SCREEN, PEOPLE'S 2;

13  CORRECT?

14  A    YES.

15  Q    WHAT CAN YOU TELL US ABOUT MR. HANCOCK'S DEMEANOR AND

16  HIS APPEARANCE?

17  A    HE APPEARED TO BE UNDER THE INFLUENCE OF ALCOHOL.

18  Q    WHY DO YOU SAY THAT?

19  A    HE HAD A STRONG ODOR.  HE APPEARED ALSO THAT HE HAD

20  JUST BEEN IN AN ALTERCATION.  HE HAD A BLACK EYE, BLACK AND

21  BLUE EYE.  HE HAD BLOOD ON HIM.

22  Q    WHAT WAS HIS ATTITUDE LIKE?

23  A    I'D SAY POOR AT BEST.

24  Q    WHAT DO YOU MEAN BY POOR?

25  A    JUST HIS DEMEANOR TOWARDS US.  HE WASN'T OVERLY

26  COOPERATIVE.  HE WASN'T COOPERATIVE AT ALL IN THE SENSE THAT

27  WHILE WE WERE ASKING HIM QUESTIONS, HE WASN'T GIVING US

28  DIRECT ANSWERS.

```
1    A    THAT'S ANOTHER OFFICER'S RESPONSIBILITY.  OUR CRIME

2    SCENE INVESTIGATOR DOES ALL OF THAT.  THEY TAKE PHOTOS AND

3    LOOK FOR FURTHER EVIDENCE.

4    Q    YOU DIDN'T NOTICE ANYTHING ABOUT THE DEFENDANT'S

5    HANDS?

6    A    NO.

7    Q    DID YOU ARREST ANYONE ELSE?

8    A    NO.

9    Q    DID YOU SUSPECT -- I SHOULDN'T SAY SUSPECT.  DID YOU

10   CONCLUDE THAT CRAIG DAVIS WAS THE VICTIM?

11   A    YES.

12         MR. KURTZMAN:  OBJECTION, YOUR HONOR, CALLING FOR

13   A LEGAL CONCLUSION.

14         THE COURT:  I'LL OVERRULE THE OBJECTION.

15   Q    (BY MR. DEMERTZIS)  BASED ON WHAT YOU KNEW AT THAT

16   TIME, IF YOU HAD TO LABEL EVERYBODY, CRAIG DAVIS WOULD HAVE

17   BEEN THE VICTIM OF SOMETHING?

18   A    THAT'S CORRECT.

19   Q    AND THE DEFENDANT JEFF HANCOCK WOULD HAVE BEEN THE

20   SUSPECT OF THIS THING?

21   A    YES.

22   Q    AND WHAT ABOUT STEVE DUNCAN, MR. DUNCAN?  DID YOU

23   MENTION HIS FIRST NAME EARLIER?

24   A    I DID NOT.

25   Q    IS IT STEVE?

26   A    YES.

27   Q    WHAT ABOUT STEVE DUNCAN?

28   A    AT THAT TIME WE JUST RULED HIM AS A FRIEND OR
```

1    A    YES.

2    Q    MR. DAVIS ALSO TOLD YOU THAT HE WAS SO BEAT UP THAT HE

3    COULD NOT FIGHT BACK?

4    A    THAT'S CORRECT.

5    Q    NOW, DEFENSE COUNSEL JUST ASKED YOU IF MR. DAVIS'S

6    INJURIES WERE CONSISTENT WITH SOMEONE BEING IN A FIGHT.

7    WHAT'S YOUR UNDERSTANDING OF THE WORD "FIGHT"?  WHAT'S A

8    FIGHT?

9    A    WELL, A FIGHT WOULD BE TWO INDIVIDUALS PARTICIPATING,

10   VERSUS ONE WITH SOMEONE THAT'S NOT PARTICIPATING.

11   Q    DO YOU THINK THAT THE DEFENDANT, MR. DAVIS, HAD A

12   FIGHT?

13          MR. KURTZMAN:  OBJECTION, SPECULATION.

14          THE COURT:  SUSTAINED.

15   Q    (BY MR. DEMERTZIS)  AT BEST MR. DAVIS'S INJURIES MIGHT

16   BE CONSISTENT WITH SOMEBODY WHO WAS REALLY ON THE LOSING END

17   OF A FIGHT?

18   A    YES.

19   Q    LASTLY, IN TERMS OF WHAT MR. DAVIS TOLD YOU AT THE

20   HOSPITAL, HE MENTIONED TO YOU THAT HE MAY HAVE, QUOTE,

21   SOCKED THE DEFENDANT IN THE EYE ONCE?

22   A    THAT'S CORRECT.

23          MR. DEMERTZIS:  THAT'S ALL THE QUESTIONS I HAVE.

24   THANK YOU, OFFICER.

25          THE COURT:  RECROSS?

26                    RECROSS-EXAMINATION

27   Q    (BY MR. KURTZMAN)  OFFICER, THAT'S WHAT MR. DAVIS

28   SAID, I SOCKED -- I MAY HAVE SOCKED MR. HANCOCK IN THE EYE

1  DOESN'T ALLEGE POLICE ABUSE AT THAT TIME; RIGHT?

2  A    YES.

3  Q    SO THE FACT YOU DON'T NOTE ANY INJURIES ON HIS ARMS

4  MEANS THERE WEREN'T ANY; CORRECT?

5  A    YES.

6  Q    NO INJURIES TO HIS ELBOWS; CORRECT?

7  A    I DON'T KNOW.  WHEN WE HAD TO RESTRAIN HIM IN THE

8  JAIL, HE WAS FIGHTING, SO AS SOON AS WE RESTRAINED HIM, PUT

9  HIM IN THE WRAP, I DON'T KNOW WHAT INJURIES OCCURRED DURING

10  THAT SCUFFLE.

11  Q    WE'RE TALKING ABOUT THE BEDROOM RIGHT NOW.

12  A    OKAY.

13  Q    ANY INJURIES TO HIS ELBOWS?

14  A    NOT TO MY RECOLLECTION.

15  Q    HOW ABOUT HIS HANDS?

16  A    NOT TO MY RECOLLECTION.

17  Q    HOW ABOUT TO HIS LEGS OTHER THAN THE KNEES?

18  A    NOT TO MY RECOLLECTION.

19  Q    AND YOU COULDN'T SEE HIS FEET BECAUSE HE WAS WEARING

20  HIS SHOES?

21  A    CORRECT.

22  Q    AND IF HE HAD HAD ANY INJURIES OR SWELLING OR CUTS OR

23  ANYTHING LIKE THAT, YOU WOULD -- OR BRUISING, YOU WOULD HAVE

24  NOTED THAT; RIGHT?

25  A    YES.

26  Q    ON A SCALE OF ONE TO TEN HOW INTOXICATED DID

27  MR. HANCOCK APPEAR TO BE?

28  A    ON A SCALE --

1   Q      HOW LONG DID YOU TRY AND GET HIM TO GO TO THE DOOR?

2   A      PROBABLY -- THAT WHOLE THING PROBABLY TOOK BETWEEN

3   FIVE AND TEN MINUTES.

4   Q      AND YOU EVENTUALLY STOPPED TRYING TO GET HIM TO GO TO

5   THE DOOR?

6   A      NO.  I -- WELL, I TRIED FOR A MINUTE OR SO AND THEN

7   STOPPED FOR A MINUTE OR TWO AND JUST RECEDED FIVE OR SIX

8   FEET BACK INTO THE KITCHEN.  I DIDN'T STOP TALKING TO HIM.

9   I WAS STILL SAYING, "COME ON, CRAIG, DON'T MAKE ME GO

10  THROUGH THIS AGAIN."

11  Q      DID MR. DAVIS EVENTUALLY LEAVE YOUR APARTMENT?

12  A      NO.

13  Q      WHY NOT?

14  A      BECAUSE ONE OF THE TIMES WHEN I WAS TRYING TO GRAB HIM

15  TO GET HIM TO GO -- AND NOW AT THIS POINT I'M USING MORE

16  FORCE, TRYING TO GET HIM TO GO, HE TURNED.  HE TURNED

17  QUICKLY, OKAY, AND I WASN'T EXPECTING IT, AND WHEN HE TURNED

18  QUICKLY, I GOT HIT RIGHT HERE ON THE LEFT-HAND SIDE OF MY

19  FACE.

20  Q      AND YOU SAY, "I GOT HIT."  DID YOU FALL INTO

21  SOMETHING?  WHAT HAPPENED?

22  A      YES.  WHEN I GOT HIT, I GOT HIT ESPECIALLY HARD.  I

23  FELT -- LIKE I SAID, THE DISTANCE OF THE KITCHEN WAS ABOUT

24  THIS WIDE.  I FELL BACK TO THE COUNTER, WHICH WAS ONLY THIS

25  FAR, A FOOT BEHIND ME, PUT MY HAND ON THE COUNTER TO BRACE

26  MYSELF.

27  Q      YOU SAID YOU GOT HIT.  DID YOU HIT YOUR HEAD ON THE

28  WALL?  WHEN YOU SAID YOU GOT HIT, FOR THE RECORD YOU

1    GESTURED TOWARD THE LEFT SIDE OF YOUR FACE.  DID YOU GET HIT

2    ON THE WALL?  WHAT HIT YOU?

3    A    I BELIEVE IT WAS A PAN OFF THE STOVE.

4    Q    AND HOW IS IT THAT YOU HIT A PAN OFF THE STOVE WITH

5    YOUR FACE?

6    A    MR. DAVIS HIT ME WITH IT.

7    Q    OKAY.  SO YOU WERE TRYING TO GUIDE MR. DAVIS OUT OF

8    THE APARTMENT, AND MR. DAVIS HIT YOU WITH A PAN OFF THE

9    STOVE?

10    A    YES.

11    Q    HOW IS IT THAT HE HIT YOU WITH A PAN OFF THE STOVE?

12    HOW DID HE GET THE PAN?

13    A    OKAY, HE HAD HIS -- WE WERE BOTH IN THE KITCHEN, IN

14    THE BORDERLINE KITCHEN AREA AND THE LIVING ROOM AREA.  RIGHT

15    THERE IN THE BORDERLINE -- I THINK THERE'S A PICTURE OVER

16    THERE.

17        BUT ON THE SIDE -- HE HAD HIS BACK TO ME, AND THE

18    STOVE WAS RIGHT -- WAS RIGHT IN FRONT OF HIM.  THE

19    COUNTERTOP WHERE THE KITCHEN -- WHERE THE UTENSILS AND ALL

20    THAT STUFF ARE WAS RIGHT BEHIND ME IN AN AREA -- WE WERE

21    BOTH IN AN AREA THIS NARROW.

22    Q    SO AS YOU WERE STANDING IN THE KITCHEN, HOW FAR WAS

23    MR. DAVIS FROM THE STOVE?

24    A    ONE FOOT.

25    Q    WAS THERE ANYTHING ON THE STOVE?

26    A    YES, THERE WAS.

27    Q    WHAT WAS ON THE STOVE?

28    A    THERE WAS A -- A COUPLE OF FRYING PANS AND, I BELIEVE,

1  Q      AND WHAT HAPPENED WITH THE KNIFE?

2  A      WELL, I PULLED IT OUT REAL QUICK, AND MR. DAVIS

3  SAID -- HE MADE A COMMENT LIKE -- LIKE -- LIKE "OOH, WHAT

4  WAS THAT" OR --.

5  Q      WHAT DID YOU PULL THE KNIFE OUT OF?

6  A      OUT OF HIM.

7  Q      SO WHEN YOU LASHED OUT WITH THE KNIFE, DID IT GO INTO

8  MR. DAVIS?

9  A      YES, IT DID.

10  Q      AND THEN MR. DAVIS MADE A COMMENT?

11  A      YEAH.  HE REACHED BACK WITH HIS HAND AND HE SAID -- HE

12  SAID SOMETHING LIKE -- ONCE AGAIN, IT WASN'T VERY AUDIBLE.

13  HE SAID SOMETHING LIKE, "OH, WHAT WAS THAT," OR -- AND

14  RUBBED IT WITH HIS HAND.

15  Q      WHAT HAPPENED NEXT?

16  A      NEXT I -- I -- I TURNED THE WATER -- I -- OKAY, I

17  TURNED THE WATER ON IN THE SINK.  I RINSED AND WASHED THE

18  KNIFE OFF, I PUT THE KNIFE INSIDE -- I HAVE A BUCKET IN THE

19  SINK WHERE THE DIRTY DISHES GO -- AND THREW THE KNIFE IN

20  THERE.  TURNED THE WATER OFF.

21      I LOOKED -- LOOK AT CRAIG, AND HE WAS ONCE AGAIN JUST

22  STANDING THE SAME WAY HE HAD BEEN STANDING THE LAST FIVE OR

23  TEN MINUTES, AND I GRABBED A COUPLE OF PAPER TOWELS, I

24  WADDED THEM UP, I WALKED OVER AND I SAID, "COME ON."  I

25  SAID, "ARE YOU GOING TO LEAVE NOW, CRAIG?"

26  Q      WHAT HAPPENED NEXT?

27  A      THAT'S WHAT I SAID.  I PLACED THE PAPER TOWELS ON THE

28  -- I COULD SEE A LITTLE BIT OF BLOOD RIGHT HERE.  I MEAN IT

1    WAS A SMALL AMOUNT.  I KNOW I SAW THE PICTURES THERE, BUT IT

2    WAS NOTHING LIKE THAT.  IT WAS A SMALL AMOUNT.  AND I PUT

3    THE PAPER TOWELS ON IT AND WITH MY ARM ON HIS SHOULDER AND

4    APPLYING DIRECT PRESSURE TO STOP THE BLEEDING.

5    Q    YOU'VE INDICATED YOUR LEFT SIDE, BASICALLY JUST AROUND

6    NIPPLE HEIGHT ON THE LEFT SIDE TOWARDS THE BACK.

7    A    YES, IT WAS LIKE RIGHT AROUND HERE.  I KNOW IT SAYS

8    "BACK" ON THERE, BUT IT WAS LIKE -- MAYBE IT WAS -- I DON'T

9    KNOW HOW YOU CONSIDER "BACK."  IT WAS LIKE ON THE SIDE IN

10   THE BACK AREA.

11   Q    AND WHAT HAPPENED AFTER YOU STARTED PUTTING THE DIRECT

12   PRESSURE ON THE CUT?

13   A    NOTHING.  I JUST -- HE MAY HAVE MUMBLED A COUPLE OF

14   THINGS, BUT WE WEREN'T STANDING THERE LIKE HAVING A

15   CONVERSATION.  I WAS JUST HOLDING THE PAPER TOWEL WITH HIM

16   THERE, AND THEN I SAID, "HERE, HOLD THIS" -- I SAID, "HERE,

17   HOLD THIS ON THERE" AND APPLIED DIRECT PRESSURE AND TRIED TO

18   GET HIM TO HOLD IT THERE, RIGHT, AND HE DID HOLD IT THERE.

19   AND I SAYS, "JUST A SECOND, I'LL BE RIGHT BACK," AND I

20   WALKED FROM THE LIVING ROOM INTO MY BATHROOM.

21   Q    AND WHAT HAPPENED AFTER YOU WALKED INTO YOUR BATHROOM?

22   A    I WENT INTO MY BATHROOM AND I OPENED THE MEDICINE

23   CABINET, BECAUSE I THOUGHT IT MIGHT HAVE HAD SOME BAND-AIDS

24   IN THERE, BECAUSE THAT'S WHAT I THOUGHT WOULD HELP STOP THE

25   BLEEDING, WAS THE BAND-AID, AND I OPENED THE CABINET, AND I

26   DIDN'T HAVE ANY BAND-AIDS.

27   Q    WHAT HAPPENED NEXT?

28   A    NEXT AFTER THAT I -- OKAY, AFTER THAT I CAME BACK OUT,

1   BUT I MAY HAVE GRABBED A TOWEL ON THE WAY OUT.  I HAVE MY

2   TOWEL IN MY BEDROOM, WHICH IS ON THE WAY OUT.  IT'S ALL A

3   MATTER OF FIFTEEN OR TWENTY FEET FROM THE BATHROOM TO WHERE

4   THEY WERE STANDING.

5   Q    WHAT HAPPENED WHEN YOU WENT OUT?

6   A    I WENT OUT AND I GOT SOME MORE PAPER TOWELS.  I

7   GRABBED SOME TOILET PAPER FROM THE BATHROOM, AND I BROUGHT

8   THAT OUT AND GAVE A WAD OF THAT TO HIM TO REPLACE THE PAPER

9   TOWELS HE ALREADY HAD ON THERE.  AND I TOOK AND I THREW THE

10  PAPER TOWELS AWAY AND -- OKAY.

11  Q    WHAT HAPPENED AFTER YOU THREW THE PAPER TOWEL AWAY?

12  A    AFTER I THREW THE PAPER TOWELS AWAY, I WAS ONCE AGAIN

13  STANDING OVER THERE RIGHT NEXT TO CRAIG, AND HE HAD THE

14  TOILET PAPER ON THERE, AND IT WAS STARTING TO GET -- WHAT DO

15  YOU WANT TO CALL IT, SATURATED.  AND SO I HAD TO GRAB

16  SOMETHING ELSE.  I DIDN'T HAVE ANY MORE TOILET PAPER, SO I

17  WENT INTO THE KITCHEN, PROBABLY FROM HERE TO THE JUDGE,

18  WHATEVER THAT IS, TEN FEET OR --

19              THE COURT:  ABOUT TEN FEET.

20              THE WITNESS:  AND THERE WAS A CABINET THERE, AND I

21  OPENED IT UP AND, THERE WAS SOME PAPER TOWELS THERE, AND I

22  GRABBED SOME AND BROUGHT THEM OUT AND PUT THEM BACK ON THERE

23  ONCE AGAIN.

24  Q    (BY MR. KURTZMAN)   AND WHAT HAPPENED AFTER YOU

25  APPLIED SOME MORE DIRECT PRESSURE TO MR. DAVIS?

26  A    ABOUT -- PROBABLY AFTER ABOUT, I'LL SAY BETWEEN FIVE

27  AND TEN MINUTES SINCE THE INCIDENT HAPPENED, ABOUT FIVE TO

28  TEN MINUTES LATER THERE WAS A KNOCK ON THE DOOR.

1    A    NO.

2    Q    WERE YOU ABLE TO HEAR WHAT WAS GOING ON IN THE FRONT

3    ROOM WHILE YOU WERE IN YOUR ROOM?

4    A    NOT -- NOT REALLY, NO.  THE DOOR WAS CLOSED.

5    Q    SO YOU CLOSED THE DOOR BEHIND YOU WHEN YOU WENT INTO

6    YOUR ROOM?

7    A    YES.

8    Q    AND YOU WERE IN THERE FOR ABOUT TEN MINUTES AND THEN

9    WHAT HAPPENED?

10   A    AND THEN -- AND THEN I WENT TO -- OKAY, AND THEN WHAT

11   HAPPENED.  I JUST WENT TO STEP OUTSIDE AND GO BACK INTO THE

12   LIVING ROOM.

13   Q    AND WHAT HAPPENED WHEN YOU TRIED TO GO BACK INTO THE

14   LIVING ROOM?

15   A    I OPENED THE DOOR AND THE DOOR OPENED ABOUT -- I

16   OPENED THE DOOR AND BUMPED INTO SOMETHING AFTER ABOUT LIKE

17   SIX INCHES OR EIGHT INCHES OF OPENING UP.

18   Q    AND WHAT HAPPENED NEXT?

19   A    I MADE A COMMENT, KIND OF A RUDE COMMENT.  I DIDN'T

20   UNDERSTAND WHY THE DOOR ONLY OPENED UP SIX INCHES AND BUMPED

21   INTO SOMETHING, BECAUSE IT SHOULDN'T HAVE.  I MADE -- I

22   DON'T KNOW IF YOU WANT ME TO SAY THE COMMENT.  I SAID, "WHAT

23   THE," EXPLETIVE, AND I CLOSED THE DOOR.

24        AND A FEW SECONDS LATER I TRIED TO OPEN THE DOOR

25   AGAIN, AND IT SLAMMED INTO SOMETHING AGAIN, AND I DIDN'T

26   KNOW THAT THE SOMETHING IT WAS SLAMMING INTO WAS AN OFFICER,

27   SUNNYVALE POLICE OFFICER'S FOOT, APPARENTLY.  AND HE SAID,

28   "STEP AWAY FROM THE DOOR, SUNNYVALE POLICE."  AND "OPEN THE

MOTIVE AS A CIRCUMSTANCE IN THIS CASE.  PRESENCE OF MOTIVE
MAY TEND TO ESTABLISH THE DEFENDANT IS GUILTY.  ABSENCE OF
MOTIVE MAY TEND TO SHOW THAT A DEFENDANT IS NOT GUILTY.

THE FLIGHT OF A PERSON IMMEDIATELY AFTER THE COMMISSION
OF A CRIME OR AFTER HE IS ACCUSED OF A CRIME IS NOT
SUFFICIENT IN ITSELF TO ESTABLISH HIS GUILT BUT IS A FACT
WHICH, IF PROVED, MAY BE CONSIDERED BY YOU IN THE LIGHT OF
ALL OTHER PROVED FACTS IN DECIDING WHETHER A DEFENDANT IS
GUILTY OR NOT GUILTY.  THE WEIGHT TO WHICH THIS CIRCUMSTANCE
IS ENTITLED IS A MATTER FOR YOU TO DECIDE.

A CONFESSION IS A STATEMENT MADE BY A DEFENDANT IN
WHICH HE HAS ACKNOWLEDGED HIS GUILT OF THE CRIME FOR WHICH
HE IS ON TRIAL.  IN ORDER TO CONSTITUTE A CONFESSION THE
STATEMENT MUST ACKNOWLEDGE PARTICIPATION IN THE CRIME, AS
WELL AS THE REQUIRED CRIMINAL INTENT.

AN ADMISSION IS A STATEMENT MADE BY THE DEFENDANT
WHICH DOES NOT BY ITSELF ACKNOWLEDGE HIS GUILT OF THE CRIME
FOR WHICH THE DEFENDANT IS ON TRIAL BUT WHICH STATEMENT
TENDS TO PROVE HIS GUILT WHEN CONSIDERED WITH THE REST OF
THE EVIDENCE.

YOU ARE THE EXCLUSIVE JUDGES AS TO WHETHER THE
DEFENDANT MADE A CONFESSION OR AN ADMISSION AND, IF SO,
WHETHER THAT STATEMENT IS TRUE IN WHOLE OR IN PART.

EVIDENCE OF AN ORAL CONFESSION OR AN ORAL ADMISSION OF
THE DEFENDANT NOT MADE IN COURT SHOULD BE VIEWED WITH
CAUTION.

IF YOU SHOULD FIND FROM THE EVIDENCE THAT THERE WAS AN
OCCASION WHEN THE DEFENDANT, ONE, UNDER CONDITIONS WHICH

1   APPROPRIATELY.

2        AS FOR THIS LESSER INCLUDED OFFENSE OF MISDEMEANOR

3   ASSAULT, THE LAW REQUIRES THAT THAT INSTRUCTION BE GIVEN.   I

4   DIDN'T CHARGE IT THAT WAY.   THE LAW REQUIRES THAT THAT

5   INSTRUCTION BE GIVEN.

6        IF YOU FIND AN ASSAULT IN THIS CASE AND YOU BELIEVE

7   THAT THE DEFENDANT USED A KNIFE, YOU HAVE TO FIND ASSAULT

8   WITH A DEADLY WEAPON.   IT'S LOGICALLY INCONSISTENT TO SAY,

9   WELL, THERE WAS AN ASSAULT, BUT I DON'T THINK IT WAS WITH A

10  DEADLY WEAPON, UNLESS SOMEONE ON THE JURY THINKS A KNIFE IS

11  NOT A DEADLY WEAPON, BUT I DON'T THINK ANYONE WOULD THINK

12  THAT.

13       WHEN MR. KURTZMAN WAS TALKING ABOUT THE BELIEVABILITY

14  OF MR. DAVIS VERSUS MR. HANCOCK AND THEN KIND OF LUMPED THEM

15  BOTH TOGETHER AND SAID THEY'RE DRUNKS, THEY WERE DRUNK, AND

16  SHOULD WE BELIEVE MR. DAVIS, SHOULD WE BELIEVE MR. HANCOCK,

17  AND HE SAID "NONE OF THE ABOVE."   THE DEFENSE IS ACTUALLY

18  URGING YOU TO BELIEVE NEITHER.

19       WELL, LET'S THINK ABOUT THAT.   IF YOU DON'T BELIEVE

20  THE DEFENDANT, IF YOU THROW OUT THE DEFENDANT'S TESTIMONY,

21  THEN YOU HAVE ZERO EVIDENCE OF SELF-DEFENSE.   NONE.   YOU

22  COULD GO BACK THERE AND ALL VOTE GUILTY RIGHT AWAY, BECAUSE

23  THERE IS SIMPLY NO EVIDENCE OF SELF-DEFENSE BEFORE YOU.   IT

24  IS NOT YOUR JOB TO CREATE A DEFENSE.

25       YOU TOOK AN OATH TO APPLY THE EVIDENCE, THE FACTS YOU

26  HEARD FROM THE WITNESS STAND, OF THE EXHIBITS, TO THE LAW.

27  I SUBMIT TO YOU THAT THE DEFENDANT WAS LYING.   I USED THE

28  WORD "LIE" A FEW TIMES, BECAUSE HE LIED.   AND THAT

1  MR. DAVIS'S VERSION IS ACCURATE.

2      BUT LET'S JUST FOR A SECOND DO WHAT THE DEFENSE WANTS

3  US TO DO.  LET'S THROW OUT BOTH VERSIONS.  WELL, THEN WE'RE

4  LEFT WITH WHAT?  WE'RE LEFT WITH SOMETHING THAT DOESN'T GET

5  DRUNK, WE'RE LEFT WITH SOMETHING THAT DOESN'T LIE.  WE'RE

6  LEFT WITH PHYSICAL EVIDENCE.

7      YOU'LL HAVE ALL THE PICTURES.  THERE'S BLOOD ALL OVER

8  THE OUTSIDE OF THE APARTMENT.  THERE'S A BLOODY KNIFE

9  OUTSIDE OF THE APARTMENT.  THERE'S A STAB WOUND IN

10  MR. DAVIS'S BACK.  THERE'S A BLOODY SHIRT WITH A STAB WOUND

11  -- I SHOULDN'T SAY STAB WOUND -- THERE'S A HOLE IN THE SHIRT

12  THAT MATCHES UP WITH THE STAB WOUND ON MR. DAVIS'S BACK.

13  THERE IS THAT SAME SHIRT, WITH BLOOD ALL OVER IT, WITH A

14  FOOTPRINT THAT MATCHES THE DEFENDANT'S SHOES.

15      I INVITE YOU WHEN YOU GO BACK THERE, LOOK AT THE

16  SHIRT, HOLD UP THE PICTURES OF THE BOTTOM OF THE DEFENDANT'S

17  SHOES AND TELL ME IF THAT DOESN'T MATCH.

18      NOW, THE DEFENDANT SAYS, OH, I SLAPPED HIM AROUND A

19  FEW TIMES.  WELL, NO, YOU DIDN'T.  YOU STOMPED ON HIM.  A

20  COUPLE OF TIMES.  AND WHEN HE WAS ASKED, "HOW DID THE BLOOD

21  GET ON THE POST OUTSIDE OF YOUR APARTMENT?"  "I DON'T KNOW."

22  OH, OKAY.  "I DON'T KNOW."

23      IF YOU BUY THE DEFENSE ARGUMENT, NO ONE CAN EVER BE

24  CONVICTED IF THEY'RE DRINKING.  ALL YOU GOT TO DO IS DRINK

25  AND COMMIT A CRIME AGAINST SOMEBODY WHO'S HAD A DRINK, AND

26  NOBODY CAN HAVE ANY IDEA WHAT HAPPENED.  HOW CAN WE POSSIBLY

27  KNOW?  THEY WERE DRUNK.  WELL, THE LAW ANTICIPATES THIS.

28  THAT'S WHY YOU GET THE INSTRUCTION VOLUNTARY INTOXICATION IS

# PROOF OF SERVICE BY MAIL

I  THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE. THAT I

CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:

ENTITLED: _Appeal of Criminal Conviction to the District Court for the Northern District of California_

BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER,

AND DEPOSITING IT IN THE [ _UNITED STATES MAIL_ ] AT AVENAL STATE PRISON AND ADDRESSED IT

TO THE FOLLOWING:

_The Clerk of the United States District Court for the Northern District of California_
_450 Golden Gate Avenue_
_San Francisco, CA, 94102-3483_

EXECUTED ON _September_ , _____, 20 _07_ AT AVENAL STATE PRISON, AVENAL CALIFORNIA

I, _Jeff Hancock_ DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW

OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

_Jeff Hancock_
SIGNITURE OF DECLARANT

_Jeff Hancock_
PRINT NAME OF DECLARANT

PRO PER.